**KESSLER TOPAZ MELTZER
   & CHECK, LLP**
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
STACEY M. KAPLAN (Bar No. 241989)
(skaplan@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:   (415) 400-3000
Fax:   (415) 400-3001

*Counsel for Lead Plaintiff HANSAINVEST Hanseatische
Investment-GmbH and Lead Counsel for the Putative Class*

[*Additional counsel listed on signature page.*]

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| HANSAINVEST HANSEATISCHE INVESTMENT-GMBH, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>v.<br><br>ENPHASE ENERGY, INC., et al.,<br><br>        Defendants. | Case No. 4:24-cv-09038-JST<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT**<br><br>Date: May 7. 2026<br>Time: 2:00 p.m.<br>Place: Courtroom 6 – 2nd Floor<br>Judge: Hon. Jon S. Tigar |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................................2

    A.    Defendants Positioned European Expansion as Enphase's Key Growth Vector.................2

    B.    Defendants' Misrepresentations Hid Structural Weakness in Enphase's European Business ..............................................................................................................................3

    C.    Defendants Had Visibility Into Adverse Conditions in the European Market ...................5

    D.    The Relevant Truth Is Gradually Revealed .......................................................................6

III.  ARGUMENT............................................................................................................................6

    A.    Plaintiff Adequately Pleads Actionable Misrepresentations and Omissions ......................6

        1.    Plaintiff Adequately Pleads Falsity....................................................................7

        2.    The Misstatements Are Not Opinions and Are Actionable ................................12

        3.    The Statements Are Not Immaterial as a Matter of Law ....................................14

        4.    The PSLRA Safe Harbor Does Not Protect Any Alleged Misstatement...............16

    B.    Plaintiff Adequately Pleads a Strong Inference of Defendants' Scienter ..........................17

        1.    Defendants Knew or Recklessly Disregarded Contemporaneous Facts................18

        2.    Defendants' Frequent Statements Supports Scienter ..........................................21

        3.    Enphase's European Business Was a Core Operation.........................................21

        4.    Plaintiff's Inference Is Stronger.......................................................................23

    C.    Plaintiff Adequately Alleges Loss Causation ...................................................................23

IV.   CONCLUSION.......................................................................................................................25

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alghazwi v. Beauty Health Co.*,
801 F. Supp. 3d 982 (C.D. Cal. 2025) ...................................................................................... 9

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ................................................................................... 17, 21, 23

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ......................................................................... 18

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .......................................................................... 23

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ................................................................................................ 14

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................................................ 6, 7, 14, 22

*In re Biomarin Pharm. Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ................................................................... 9, 16, 23

*Bodri v. GoPro, Inc.*,
252 F. Supp. 3d 912 (N.D. Cal. 2017) .................................................................................. 23

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ........................................................................................ 13, 17

*City of Hollywood Firefighters Pension Fund v. Atlassian Corp.*,
2024 WL 3823801 (N.D. Cal. Aug. 13, 2024) ....................................................................... 10

*City of Mia. Gen. Emps' & Sanitation Emps' Ret. Tr. v. RH, Inc.*,
302 F. Supp. 3d 1028 (N.D. Cal. 2018) ................................................................................ 24

*Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc.*,
-- F.4th --, 2026 WL 292424 (9th Cir. Feb. 4, 2026) ....................................................... *passim*

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) .............................................................................................. 17

*Dolly v. GitLab Inc.*,
2025 WL 2372965 (N.D. Cal. Aug. 14, 2025) ....................................................................... 25

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ............................................................................................................. 23

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) .......................................................................................... 19, 21

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

*Eminence Cap., L.L.C. v. Aspeon, Inc.*,
316 F. 3d 1048 (9th Cir. 2003) .............................................................................................. 25

*In re Fastly, Inc. Sec. Litig.*,
2021 WL 5494249 (N.D. Cal. Nov. 23, 2021) ........................................................................ 17

*In re Fastly, Inc. Sec. Litig.*,
801 F. Supp. 3d 880 (N.D. Cal. 2025) ...........................................................................*passim*

*In re Finisar Corp. Sec. Litig.*,
2017 WL 1549485 (N.D. Cal. May 1, 2017) .......................................................................... 21

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ................................................................................................. 6

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ..........................................................................................*passim*

*Grossman v. Sin*,
2025 WL 1330087 (C.D. Cal. Mar. 31, 2025).................................................................12-13, 16

*In re Intuitive Surgical Sec. Litig.*,
2014 WL 7146215 (N.D. Cal. Dec. 15, 2014)........................................................................ 22

*Jaeger v. Zillow Grp., Inc.*,
644 F. Supp. 3d 857 (W.D. Wash. 2022)....................................................................... 12, 13, 15

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .................................................................................................... 2

*Kipling v. Flex Ltd.*,
2020 WL 2793463 (N.D. Cal. May 29, 2020)......................................................................... 8

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ............................................................................................... 11

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ................................................................................................. 24

*Markette v. Xoma Corp.*,
2017 WL 4310759 (N.D. Cal. Sep. 28, 2017) ....................................................................... 13

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ................................................................................................... 7

*Mineworkers Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ...................................................................................... 2, 23, 24

*Mulligan v. Impax Labs, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ..............................................................................14-15, 16

*Ng v. Berkeley Lights, Inc.*,
2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ................................................................... 13, 25

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ...............................................................................................11

*In re Nuvelo, Inc. Sec. Litig.*,
   668 F. Supp. 2d 1217 (N.D. Cal. 2009) ..................................................................................16

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2.....................................................................................................21-22

*Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*,
   2024 WL 4353049 (N.D. Cal. Sep. 30, 2024) ........................................................................15

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
   780 F. App'x 480 (9th Cir. 2019) .............................................................................................9

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)...........................................................................................................12, 13

*In re Origin Materials, Inc. Sec. Litig.*,
   766 F. Supp. 3d 998 (E.D. Cal. 2025)..................................................................................13-14

*In re Palo Alto Networks, Inc. Sec. Litig.*,
   2025 WL 1093247 (N.D. Cal. Apr. 11, 2025) ........................................................................10

*In re Plantronics, Inc. Sec. Litig.*,
   2022 WL 3653333 (N.D. Cal. Aug. 16, 2022) ........................................................................15

*Plumbers & Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*,
   2024 WL 4251896 (N.D. Cal. Sep. 17, 2024) ........................................................................25

*In re Qualcomm Inc. Sec. Litig.*,
   2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ........................................................................21

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ..........................................................................8, 15, 16, 18

*In re QuantumScape Sec. Class Action Litig.*,
   580 F. Supp. 3d 714 (N.D. Cal. 2022) ...............................................................................10, 16

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ..........................................................................17, 18, 21, 23

*Robb v. Fitbit Inc.*,
   2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ..........................................................................22

*Roberts v. Zuora, Inc.*,
   2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) .......................................................................9, 17

*S. Ferry LP # 2 v. Killinger*,
   399 F. Supp. 2d 1121 (W.D. Wash. 2005)..............................................................................14

*S. Ferry LP # 2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009)..............................................................................21

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

*S. Ferry LP #2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .................................................................................................21

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ..............................................................................................7, 17

*SEC v. Todd*,
    642 F.3d 1207 (9th Cir. 2011) ..................................................................................................7

*Smilovits v. First Solar Inc.*,
    119 F. Supp. 3d 978 (D. Ariz. 2015) ......................................................................................25

*In re Splunk Inc. Sec. Litig.*,
    592 F. Supp. 3d 919 (N.D. Cal. 2022) .................................................................................8, 15

*Stephens v. Maplebear Inc.*,
    2025 WL 1359125 (N.D. Cal. May 9, 2025) ..........................................................................13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ..............................................................................................6, 17-18, 21

*In re Twitter, Inc. Sec. Litig*,
    2021 WL 4166725 (N.D. Cal. Sept. 14, 2021) .......................................................................16

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ...................................................................................17

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ..................................................................................................19

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ..............................................................................15

*Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*,
    2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ........................................................................17

*Westley v. Oclaro, Inc.*,
    2012 WL 1038647 (N.D. Cal. Mar. 27, 2012)........................................................................11

*Zaghian v. Farrell*,
    675 F. App'x 718 (9th Cir. 2017) ...........................................................................................17

**Statutes**

15 U.S.C. § 78j...............................................................................................................................vii

15 U.S.C. § 78t...............................................................................................................................vii

**Other Authorities**

17 C.F.R. § 240.10b-5.....................................................................................................................vii

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

## STATEMENT OF ISSUES TO BE DECIDED

Whether the First Amended Consolidated Amended Complaint for Violations of the Federal Securities Laws (Dkt. No. 85) (the "AC") adequately alleges claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## I.    INTRODUCTION[1]

This case concerns Defendants' concealment of collapsing demand for Enphase's products in its key European market. As Enphase's U.S. sales declined in early 2023, its European business became critical to maintaining its growth and stock price. Throughout the Class Period, Defendants assured investors that European demand remained robust, growth was accelerating, and any challenges were merely temporary macroeconomic headwinds. These statements were materially false and misleading.

In reality, beginning in early 2023, demand for Enphase's premium-priced microinverters collapsed across key European markets. Multiple witnesses confirm that, in this period, Chinese manufacturers offering comparable products at 50% lower prices were decimating Enphase's market share. Moreover, Enphase's purported quality advantage—the sole justification for its pricing premium—evaporated due to product failures and service deficiencies that frustrated European installers and end-users alike.

Defendants were well aware of these conditions. The AC details multiple internal reporting systems that provided Kothandaraman with real-time visibility into European market conditions. Kothandaraman himself characterized Enphase's weekly European sales reviews as "meticulous" examinations of "point of sales in Europe by country, by distributor." Senior managers repeatedly escalated warnings about deteriorating demand and intensifying Chinese competition directly to European leadership. Defendants, however, assured investors that European business "remained strong," was experiencing "strong broad-based growth," and that "the fundamental drivers aren't changing."

When Defendants finally disclosed a European demand problem in October 2023, they continued their obfuscation, blaming "broad macroeconomic conditions" and assuring investors the "pullback in Europe will be temporary as the fundamentals remain strong." They repeated this pattern for several quarters, claiming Europe was recovering without disclosing the structural problems impacting Enphase's European business. It was only in October 2024 that the relevant truth concealed by Defendants' misstatements was finally disclosed, as Defendants revealed another decline in Europe, causing analysts to recognize that Enphase had "structural problems" and was "losing share to Chinese competitors."

---

[1] All capitalized terms herein have the same meaning as in the AC. Citations to "¶[•]" refer to paragraphs in the AC and "MTD" refers to Defendants' Motion to Dismiss the AC (Dkt. No. 86). Unless otherwise noted: (i) all emphasis is added; (ii) all internal citations, quotations, and original emphasis are omitted; and (iii) original alterations are incorporated.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

Defendants' motion to dismiss ("Motion") advances arguments that cannot survive the pleading-stage standard requiring courts to accept all allegations as true and draw all reasonable inferences in Plaintiff's favor. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018).

*First*, Defendants argue that Plaintiff fails to plead falsity. To the contrary, the AC details through multiple corroborating sources that by early 2023 demand for Enphase products in Europe contracted and Chinese competition surged, rendering Defendants' statements misleading. Defendants' assertion that they warned of the risks ignores that their statements obfuscated the reality that demand *had already* collapsed and that Chinese competitors were *already* taking market share. *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 781 (9th Cir. 2023) (risk disclosures misleading when they "do not alert the reader that some of these risks may already have come to fruition").

*Second*, Defendants argue the AC fails to plead scienter, claiming Plaintiff merely speculates about their knowledge. This ignores the detailed allegations of Defendants' "meticulous" weekly reviews of European sales data, direct warnings from sales leadership about deteriorating European market conditions, and Kothandaraman's own emphatic representations about his granular, real-time knowledge of European markets. The inference that Defendants knew or recklessly disregarded the structural problems plaguing their most critical growth market is the more compelling inference. *See Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc.*, 2026 WL 292424, at *20 (9th Cir. Feb. 4, 2026).

*Finally*, Defendants' loss causation arguments ignore that only a "causal connection between the fraud and the loss" is required. *Mineworkers Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Here, both disclosures revealed the facts Defendants concealed—demand problems in Enphase's European business—causing substantial stock price declines.

Plaintiff respectfully submits that Defendants' Motion should be denied.

## II.    STATEMENT OF FACTS

### A.    Defendants Positioned European Expansion as Enphase's Key Growth Vector

Enphase sells solar microinverters used primarily in residential installations. ¶¶2, 39. Unlike string inverters, which convert electricity for multiple solar panels on a single inverter, microinverters convert at each individual solar panel. ¶¶2, 40-41. Microinverters offer certain advantages, but are often pricier. *Id.* Indeed, during the Class Period, Enphase charged prices double or triple that of string inverters. ¶¶2, 43.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

Enphase primarily sold microinverters through a three-tiered system: first, Enphase sold to distributors, who then sold to installers, who then sold to residential end-users. ¶44. Enphase recognized revenue when it shipped its products. ¶45. Enphase worked closely with its distributors and installers to "increase sell through" to end-users to purportedly avoid inventory build-up in its channel. ¶¶45, 61, 65.

For years, Enphase primarily sold its microinverters in the U.S. ¶47. Leading up to the Class Period, Enphase rapidly expanded its European business, particularly its three largest European markets: the Netherlands, France, and Germany. ¶¶47-52. Then, beginning in early 2023, Enphase's U.S. business began to decline. ¶¶3, 53-58. Defendants and the market were thus hyper-focused on Enphase's European business to "offset" the U.S. "slowdown" and drive growth. *Id.*

**B.    Defendants' Misrepresentations Hid Structural Weakness in Enphase's European Business**

During the Class Period, Defendants misleadingly reassured investors about Enphase's European business, downplaying or concealing significant structural hurdles Enphase was facing. *First*, Defendants portrayed European demand as robust and experiencing rapid growth and assured the market that Enphase was positioned to take advantage of that demand. ¶¶95, 125-30, 142-46. Kothandaraman stated, for example, on April 25, 2023, that "*[o]ur European business is growing rapidly*" and "*[o]ur business is growing much faster than the market*" and on July 27, 2023, claimed Enphase "*saw strong broad-based growth across Europe in Q2*," and "*we are hearing from*" customers that "*[t]he fundamental drivers aren't changing*." ¶¶95-96, 125-26, 146. Defendants further stated that the "*company continues to see strong demand across geographies with no price pressure given demand fundamentals and value-added products*" and it "*[w]as not seeing pricing pressure given its differentiated products despite select reports of price declines on Chinese-based string inverters*." ¶138. Analysts repeated Defendants' assurances, stating for example that "European [g]rowth [r]emains [s]trong" and that European growth "will help to partially offset the near term [sic] headwinds in North America." ¶132.

*Second*, after finally disclosing a demand slowdown in October 2023, Defendants described the challenges as temporary, and blamed macroeconomic factors. ¶¶155-57. Kothandaraman stated, for example, that the slowdown "*is due to broad macroeconomic conditions*" and "*will be temporary as the fundamentals remain strong*." ¶¶155, 157. Defendants subsequently claimed that "[w]e are seeing Europe starting to pick back up," "*[t]he market stabilized . . . and we are encouraged by the demand signals we*

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

*see*," "Europe has ***already begun to recover***" and "***with these growth trends, we expect sell-through to continuously go up***." ¶¶166, 173-75. Responding to analyst questions, Kothandaraman stated that "***[w]e are very strong in Netherlands, strong in France, we're strong in Germany***." ¶186. Analysts credited Defendants' assurances—reporting that "Europe [was] a budding bright spot." ¶179.

These statements were materially false and misleading because: (i) internal data demonstrated that demand for Enphase's products was declining across European markets starting in early 2023; and (ii) Enphase's core problems were structural and permanent—the solar market in key European countries had reached saturation, Enphase was actively losing market share to Chinese manufacturers selling comparable products at 50% lower prices, and Enphase was experiencing issues related to customer service and products that undermined its value proposition. ¶¶163, 170, 182, 187. In the Netherlands, the slowdown intensified after summer 2023, with demand further weakening in the ensuing fall and winter seasons. ¶75.

**Demand Saturation and Contraction**. Demand for Enphase's products declined across Europe beginning ***in early 2023***—not late 2023 as Defendants claimed. Witnesses confirm that during this period, internal data showed deteriorating demand. FE-1, a sales leader managing approximately 5% of Enphase's European sales, saw declining customer demand beginning in ***early 2023*** that persisted through 2Q23—definitively ruling out seasonality as an explanation. ¶¶71-73, 80. By June 2023, FE-1 escalated warnings about this decline to European sales leader Marco Krapels. ¶72. FE-2, a Key Account Manager controlling 35-40% of Netherlands sales, observed through Salesforce data that Enphase's market share erosion began in early 2023. ¶¶33, 69. By mid-2023, FE-2 described the atmosphere as like being on the Titanic. ¶69.

Contrary to Defendants' representations about Enphase's European strength, according to FEs, key European markets had reached saturation, Enphase was losing share to competitors, and Enphase was unable to penetrate other critical markets. ¶¶70, 72, 74, 77-78. FE-3 recalled that by summer 2023, he heard from installers and saw in internal data that the solar market in the Netherlands was saturated. ¶74. In Germany, FE-2 and FE-3 stated Enphase failed to gain market share, while FE-2 stated that Enphase lost existing business. ¶¶76-77. In Poland, another key growth market, FE-3 reported sales never took off. ¶78.

**Chinese Competition**. During the Class Period, Chinese manufacturers were taking Enphase's market share. ¶¶79-88. In the first half of 2023, FE-2 lost business across Benelux and Germany to Chinese competition because Enphase's prices were not competitive. ¶81. Similarly, FE-3 heard from installers in

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

the Netherlands and Belgium by August or September of 2023 that they were getting more work from Chinese competitors and that those competitors' lower prices were the biggest reason Enphase was losing sales. ¶82. FE-4 heard similar feedback from installers in France. ¶83. Independent industry participants validated these accounts: CI-2, a European distributor, confirmed in February 2024 that "Chinese competitors are taking share and pricing is decreasing." ¶¶87-88; *see also* ¶¶85-86 (CI-1: "Chinese producers" were selling microinverters "doing almost the same thing" as Enphase at "maybe less than half the price" making it "very, very, very difficult for [Enphase] to gain market share.").

**Product and Service Problems**. Enphase's purported quality advantage over competitors—the justification for its pricing premium—evaporated due to product problems and service deficiencies in Europe. FE-3 explained that: (i) Enphase's microinverters faced connectivity issues that caused service disruptions in Netherlands, Spain, France, and Italy (¶90); (ii) installers complained during summer of 2023 that they had to use other inverters because Enphase's microinverters were too difficult to install relative to competitors (¶91); and (iii) Enphase's customer support representatives were not effective for installers or end-users (¶92). FE-3 indicated Enphase lost business because of these issues and that installers told him this directly during his tenure. ¶93.

C.    **Defendants Had Visibility Into Adverse Conditions in the European Market**

Defendants maintained systematic, real-time visibility into market conditions in Europe through multiple monitoring systems that provided country-specific demand and performance indicators, and thus gave them direct insight into demand issues in Europe and the structural issues behind them. ¶¶60-66. *First*, Kothandaraman, along with other senior executives and senior sales leadership, attended weekly European sales review meetings that, among other things, examined actual vs. forecasted shipments to distributors and distributor sales-to-installer data to assess the strength of channel sell-through, with country heads explaining discrepancies and assessing the strength of the Company's sales. ¶60. Kothandaraman himself characterized these sessions as "meticulous" reviews conducted "every week where we look at point of sales in Europe by country, by distributor," demonstrating his personal involvement in tracking European demand. ¶61. Through these weekly reviews, management tracked specific inventory metrics, including "how much is our sell through, how much is our sell-in" against defined inventory "guardrails" of 8-10 weeks, enabling real-time identification of "which of the installers aren't doing enough volume." *Id*.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

*Second*, Kothandaraman frequently emphasized the Company's direct communication with installers that provided Enphase with visibility into the European market, asserting that Enphase leadership was "very close to [its] customers" and learned about demand in Europe from them. ¶65. Additionally, Enphase monitored activation data for the Netherlands market on at least a "weekly basis." ¶63. As a result, Defendants had clear visibility into the serious structural problems affecting Enphase's European business, given the declining demand for Enphase products that installers were reporting across Europe.

**D.    The Relevant Truth Is Gradually Revealed**

On October 26, 2023, Enphase disclosed "a substantial demand reduction in Europe," that European revenues had declined, and that it was reducing guidance for the following quarters because it had overfilled its channel, and thus would be "undershipping" by "approximately $150 million" for several quarters to clear the inventory backlog. ¶¶101-02. In response, Enphase's stock fell by nearly 15%. ¶103. Nevertheless, Defendants minimized their disclosures by characterizing the problems as temporary, and blaming macroeconomic factors, while concealing the underlying structural issues. ¶107.

On October 22, 2024, Enphase revealed a revenue decrease that was "the result of a further softening in European demand." ¶116. The Company also revealed that sell-through in Europe was down. *Id*. On this news, Enphase's stock fell nearly 15%. ¶118. Analysts tied the disclosure to structural challenges that Defendants had previously concealed—writing: "*in our experience actual demand rarely changes so quickly . . . . We think the issue is much simpler. ENPH . . . . is losing share to Chinese competitors who are willing to sell at less than half ENPH's level.*" ¶¶274-75.

### III.    <u>ARGUMENT</u>

In resolving this Motion, the Court must consider the AC in its entirety, accept all allegations as true, and draw all reasonable inferences in Plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings[.]" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

**A.    Plaintiff Adequately Pleads Actionable Misrepresentations and Omissions**

"[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

527 F.3d 982, 985 (9th Cir. 2008). Further, "statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Thus, if a company presents positive information, it must also "disclos[e] adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). "Generally, whether a public statement is misleading, or whether adverse facts were adequately disclosed[,] is a mixed question to be decided by the trier of fact," and resolution "as a matter of law is only appropriate when the adequacy of the disclosure is so obvious that reasonable minds could not differ." *SEC v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011).

### 1.    Plaintiff Adequately Pleads Falsity

Here, Defendants made statements that gave an "impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Berson*, 527 F.3d at 985. They positively spoke about the underlying strength of Enphase's European operations, stating that, despite concerns about oversupply, "[t]he fundamental drivers aren't changing" for us (¶146) and that the "European business remained strong" with "strong broad-based growth across Europe in Q2," specifically identifying the "Netherlands . . . continu[ing] to be very strong for us" (¶142). And after belatedly revealing a demand decline, Defendants attributed the issue "to broad macroeconomic conditions" (¶157), representing that "[t]he market stabilized during Q1[24], and we are encouraged by the demand signals we see" (¶173).

In reality, the AC details through corroborating sources that Enphase saw a contraction in demand in Europe by early-to-mid 2023, and was losing share to competitors in key European countries. *E.g.*, ¶¶135, 150, 170. For example, in the Netherlands, FE-2 recounted that: (i) in early 2023, the residential market dried up and Enphase's sales declined; (ii) at the same time, sales data maintained on Salesforce showed Enphase was losing market share; (iii) by mid-2023, the problems worsened due to distributors ordering less product and installations diminishing further; and (iv) installers directly informed him Enphase was losing business due to its high pricing relative to Chinese competition. ¶¶69, 81. FE-1 shared a similar account for his region. ¶¶71-72. FE accounts of Enphase losing European business to lower priced Chinese competitors (*see, e.g.*, ¶¶80-83) are corroborated by European distributors (CI-1 and CI-2), who stated that Chinese producers were selling inverters at 50% of Enphase's cost (¶¶85-88). CI-2 recounted these producers were taking share from higher-priced producers like Enphase. ¶88. Simultaneously,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

FE-3 learned from installers that Enphase was losing business due to product-specific issues. ¶¶89-93.

By positively touting Enphase's European business, Defendants were "required to disclose adverse information that cut against that positive statement." *See In re Fastly, Inc. Sec. Litig.*, 801 F. Supp. 3d 880, 897-98 (N.D. Cal. 2025) (Tigar, J.) (holding statement that "Fastly was not seeing any 'slowing in growth' like its competitors were seeing" was materially false or misleading when made). By failing to disclose adverse facts, Defendants' statements gave "the inaccurate impression" that Enphase was not encountering Company-specific demand contraction, and later that the contraction it was seeing was temporary and caused by macroeconomic conditions, rather than the reality that Enphase was losing market share to lower priced competitors. *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 942 (N.D. Cal. 2022) (Tigar, J.) (statement that company's "investments in marketing and their sales personnel headcount were sufficient for the company to build adequate pipeline to meet its growth and revenue targets" deemed actionably misleading). Falsity is thus adequately pled. None of Defendants' arguments to the contrary has merit.

**The Witness Accounts Are Sufficiently Reliable**. Faced with these facts, Defendants resort to meritless attacks on the well-pled FE allegations. MTD 11. Courts credit FE accounts that are pled with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017). Here, Plaintiff pleads each witness's tenure, "job description and responsibilities,[2] and, in some instances, the [FE's] exact title and to which [] executive the witness reported," as well as the basis for their knowledge. *Id.* at 1145; ¶¶32-38. These "description[s] adequately explain[] how" each witness "possessed the personal knowledge" attributed to them in the AC. *Forescout*, 63 F.4th at 771.

Notably, Defendants do not argue that any witness lacked a basis to know the information attributed to him. MTD 11. Instead, they argue that the FEs did not have insight into "overall European results." *Id.* at 1. But "[t]he adequacy of the [AC] does not depend on each [witness] possessing inside knowledge about corporate-level trends; Plaintiff[] need only provide a basis for each [witness's] knowledge about the

---

[2] Defendants' contention that the AC fails to specify the witnesses' job descriptions and responsibilities is demonstrably false. MTD 11; *see* ¶32 (describing FE-1's job responsibilities); ¶33 (FE-2 job responsibilities); ¶34 (FE-3 job responsibilities); ¶35 (FE-4 job responsibilities); ¶37 (CI-1 job responsibilities); ¶38 (CI-2 job responsibilities). As a result, Defendants' citations (MTD 11) are misplaced. *See, e.g., Kipling v. Flex Ltd.*, 2020 WL 2793463, at *16 (N.D. Cal. May 29, 2020) ("[N]o accompanying description of what th[e] [FE] titles entailed.").

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

specific statements he made," which, as discussed above, it does. *Forescout*, 63 F.4th at 771. Moreover, here, FEs did report insight into broad European demand trends. *See, e.g.*, ¶¶60-61. Nor must FEs have direct contact with Defendants. MTD 19-20; *see Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.5 (9th Cir. 2019) (refusing to discount allegations from FE who lacked direct contact with defendant because FE was in "position to be personally knowledgeable" about facts reported); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020) (rejecting argument that FE lacked "direct contact" with defendants). Regardless, certain FEs here reported exactly that. *See, e.g.*, ¶¶72-73 (FE-1 describing meetings where Kothandaraman was informed about declining demand). Defendants also fault the witnesses for relying on information gleaned from conversations with installers or other Enphase personnel. MTD 11. But these witnesses "described conversations that they themselves heard" or "practices to which they themselves were subjected" which courts routinely credit. *Forescout*, 63 F.4th at 771. Indeed, Defendants themselves indicated that they regularly relied on similar conversations with installers to provide insight into demand trends. *See, e.g.*, ¶¶65-66.

Defendants' other attacks on FEs (MTD 11) advance arguments frequently rejected by courts. *See, e.g.*, *In re Biomarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *11 n.8 (N.D. Cal. Jan. 6, 2022) (crediting FE accounts does not require "mini-trial[s] on the admissibility of the evidence"). Their claim as to CI-1 and CI-2 that "Plaintiff blindly copied internet rumors without making any effort to verify them" (MTD 11-12) is meritless. The CI allegations are not based on "rumors" but interviews sourced from a credible intelligence platform, AlphaSense, which provides interview transcripts that explain how the witnesses possessed their knowledge. *Alghazwi v. Beauty Health Co.*, 801 F. Supp. 3d 982, 1006 (C.D. Cal. 2025) ("personal knowledge can be inferred" because complaint "identifies their job titles, duties, reporting structure, and dates of employment, such that the [c]ourt can make inferences about the type of information that they would reasonably have been exposed to"). Lead Counsel also conducted an investigation to verify the source of the information. ¶36 (facts pled based on the "transcripts and/or Plaintiff's investigation").[3]

**Defendants' Arguments Regarding Pre-October 2023 Statements Fail**. Defendants' falsity challenges for the pre-October 2023 statements are meritless. *First*, Defendants argue that they cannot be liable, because purportedly "unexpected" "macroeconomic headwinds" manifested in Europe only in

---

[3] Defendants' inapposite cases involved "[u]nsubstantiated" interviews in short-seller reports. MTD 12.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

3Q23, at which point they "promptly" disclosed them. MTD 1. This argument ignores the AC's well-pled allegations and asks the Court to credit Defendants' competing version of events. *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 729 (N.D. Cal. 2022) ("[A]ll reasonable inferences" must be drawn "in favor of the plaintiff."). Plaintiff alleges particularized facts that demand slowed down by early 2023 (e.g., ¶150(a)) and Enphase was failing to penetrate new markets and was losing share to Chinese competitors due to price and its own product quality issues (e.g., ¶150(b)-(d)). These material adverse facts existed at the time Defendants made their statements. *Fastly*, 801 F. Supp. 3d at 897-98.

*Second*, Defendants' argument that they are immunized by broad risk disclosures about uncertainty or seasonality (MTD 2-3, 13) fares no better. The AC alleges that Enphase's European business was already faltering due to systemic issues, not mere seasonality. *E.g.*, ¶¶71, 150(a). Moreover, these broad warnings of potential future risks cannot protect Defendants because the problems had *already* manifested. *See, e.g.*, *Forescout*, 63 F.4th at 781. Defendants' contention that no investor could have been misled given these disclosures (MTD 13), is belied by the significant stock declines once the relevant truth was revealed.

*Third*, Defendants' argument that the witness accounts concerning *demand* (*e.g.*, ¶¶69-74)[4] are "irreconcilable" with Enphase's reported 1Q23 and 2Q23 *revenue* results for Europe (MTD 13) is equally unavailing because it conflates lagging revenue recognition with underlying demand. Enphase recognized revenue when it "ship[ped] product to [its] distributors," whereas demand reflected the amount of Enphase product end-users bought from installers (who typically purchased from distributors). ¶45. With respect to demand, Defendants concealed underlying declines and, after these trends resulted in a massive channel inventory buildup, told the market that the problems were mere "seasonality" and that the fundamental drivers were strong. *See, e.g.*, ¶¶135, 139, 150.[5]

---

[4] Defendants claim that FE accounts of declining demand are insufficient without the exact rates of decline, or the precise financial impact of competition. MTD 13-14. But this detail is not required at the pleading stage. *See Forescout*, 63 F.4th at 768-69, 783 (falsity pled even though complaint did not "identify specific information within internal reports or data that conflicted with public statements"). Defendants' authorities (MTD 13) involved unreliable witness accounts that concerned revenues rather than underlying demand. *See In re Palo Alto Networks, Inc. Sec. Litig.*, 2025 WL 1093247, at *5 (N.D. Cal. Apr. 11, 2025) (discounting witness who "never heard of a single sale" when company publicly reported sales); *City of Hollywood Firefighters Pension Fund v. Atlassian Corp.*, 2024 WL 3823801, at *5 (N.D. Cal. Aug. 13, 2024) (holding "vague" CW account "seem[ed] to be referring to revenue growth," rather than demand, rendering his account inconsistent with reported revenues).

[5] Defendants' suggestion that they informed investors of demand by disclosing sell-through data (MTD 13) is misleading. They did not disclose their actual sell-through figures for 1Q23, and for 2Q23, they disclosed only sell-through growth relative to 1Q23, not the underlying data itself.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

*Fourth*, Defendants claim that their statements merely addressed "unchallenged financial results" and point to the fact that Enphase "met guidance." MTD 13-14. But Plaintiff does not allege that Defendants' guidance or results were false. Instead, the AC challenges Defendants' reassurances about the strength of Enphase's European business in the face of changing market dynamics and direct dismissals of negative impact from those factors. These statements were contradicted by the facts on the ground. *See, e.g.*, ¶¶135, 139, 150. Even if Defendants' statements could be read as only describing revenue results, they are archetypal half-truths. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (finding statement "plainly misleading" even though "this may have been true").

*Finally*, Defendants' argument that the June 7, 2023 statement published in an analyst report (¶138) is not attributable to them (MTD 16) is meritless. The analyst made clear that the statements originated from Enphase "management," which "highlighted" that they saw "strong demand across geographies with no price pressure given demand fundamentals and value-added products" and were "not seeing pricing pressure." ¶138. Where statements in an analyst report "clearly originated" from Defendants, and were not just an analyst's vague "impression" of those statements, they are actionable even if "not exact quotations." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004).[6]

**Defendants' Arguments Regarding Their Statements from October 2023 and After Fail**. Defendants next argue that Plaintiff fails to plead falsity for ¶¶155-59, 166-67, 173-77, 185-86 because Enphase "promptly informed investors" of the European slowdown in October 2023. MTD 15-16. But these statements were misleading because Defendants characterized the slowdown as temporary and blamed it entirely on macroeconomic factors (e.g., ¶¶155-57), while downplaying the structural, Company-specific problems that were impacting demand (e.g., ¶¶163, 170). *See Forescout*, 63 F.4th at 770.

*Second*, Defendants' contention that the witness accounts do not speak to events after summer 2023 (MTD 16) fares no better. Each witness account describes structural problems—notably, lower priced competition taking market share—not short-term macroeconomic trends that would quickly resolve. *See* ¶¶163, 170, 182, 187. These were the very conditions that *caused* the inventory buildup and demand decline

---

[6] By contrast, in *Westley v. Oclaro, Inc.*, 2012 WL 1038647, at *5 (N.D. Cal. Mar. 27, 2012) (MTD 16), an analyst merely discussed its "impressions on unspecified oral statements," by reporting "continu[ed] bullishness from [the defendant company and a peer company] at [a conference]."

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

Defendants partially disclosed in October 2023, yet Defendants attributed that decline solely to transient macroeconomic factors. *Id*. Nonetheless, the AC pleads facts that Enphase's issues became more severe in late 2023 and early 2024. *See, e.g.*, ¶75 (FE-3 reported that sales declined even more after the summer of 2023 and the slowdown worsened into the winter, while detailing that installers specifically indicated that Enphase lost business due to installation and connectivity issues during this time); ¶88 (CI-2: Enphase and other American and European producers were losing share to Chinese competition).

*Third*, Defendants' assertion that purportedly "positive" results in 1Q24 and 2Q24 vindicate their recovery statements (MTD 16) is a red herring. To start, in 4Q23, Defendants significantly lowered Enphase's sales into its channel in an attempt to clear an inventory glut caused by pushing too much revenue into the channel in 2023. ¶109. The fact that Enphase posted sequential *revenue* growth in 1Q24 over a quarter where they admittedly were not fully selling into the channel, does not demonstrate a *demand* recovery as they now claim. For 2Q24, Enphase posted "flat" sequential revenue growth, which likewise fails to support any recovery narrative. Dkt. No. 87-10 at 6 (MTD Ex. 10). Moreover, analysts understood Defendants' misstatements to convey Enphase's slowdown stemmed purely from macroeconomic and/or market-wide factors, not structural issues. *See, e.g.*, ¶161 (October 27, 2023, HSBC: "no structural issue in end demand in Europe"); *see also Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 872 (W.D. Wash. 2022) ("Plaintiff has alleged that analysts drew from Defendants' public statements the (incorrect) conclusion[.]"). This false impression was corrected on October 23, 2024—when analysts specifically noted that, for example, "structural problems [] will continue to pressure margins, including . . . competition from . . . China's players." ¶273 (October 23, 2024, William Blair).

## 2.    The Misstatements Are Not Opinions and Are Actionable

Defendants argue that "[a]ll but one" of their misrepresentations are nonactionable opinions. MTD 6. But statements that "express[] certainty about a thing" are not "opinions." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 176 (2015); *e.g.*, ¶126 ("***Our business is growing much faster than the market***."); *see also* ¶¶125, 128-30, 142-46, 156-59, 166, 167, 173-77, 185. Other statements are not qualified by any expression of "belief, [] view, or [] sentiment" or Plaintiff did not allege that the clause including that language is actionable. *Omnicare*, 575 U.S. at 183 (opinions contain "I think" or "I believe"); *Grossman v. Sin*, 2025 WL 1330087, at *26 (C.D. Cal. Mar. 31, 2025)

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

("Statements that do not use opinion-qualifying language such as 'I think' or 'I believe' . . . are not opinions."); *e.g.*, ¶146 ("***This is what we are hearing from all of [Enphase's customers]. The fundamental drivers aren't changing***."); *see also* ¶¶129, 155-56, 167, 175-76.[7]

Even if Defendants' statements contain opinions, they are still actionable. Statements containing opinions are actionable if: (i) "the speaker did not hold the belief she professed" and the belief is objectively untrue; (ii) an embedded fact contained within an opinion was untrue; *or* (iii) the statement omitted "facts going to the basis for the [speaker's] opinion whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017).[8] Plaintiff only needs to satisfy one *Align* prong for an opinion to be actionable. *Id.*

The statements Defendants challenge as opinions are actionable under the second and third *Align* prongs. For example, Defendants' statements that "the fundamental drivers" of Enphase's European business "aren't changing" (¶146), that Enphase saw continued strength in Netherlands and Germany (¶¶142-43, 145), and that its European business had a "lot of levers" for growth (¶159) and was "growing rapidly" and "doing incredibly well" (¶125-26, 130), are actionable misrepresentations because they contained a false statement of fact about demand for Enphase's products, which already was declining (*see, e.g.*, ¶¶150, 163). Likewise, Defendants' post-October 2023 statements attributing the demand slowdown to temporary macroeconomic factors (*e.g.*, ¶¶156-57) such that any effects would be short-term (¶¶166-67, 175) included a false fact about the cause and timeframe of the slowdown, which was Enphase-specific and long-term (¶¶170, 182). *See In re Origin Materials, Inc. Sec. Litig.*, 766 F. Supp. 3d 998, 1014-15

---

[7] Defendants attempt to create *additional* categories of "opinion" statements beyond what is expressly identified in *Omnicare* (MTD 6-7) fails. If the statement expresses certainty or is not prefaced with an expression of belief, view, or sentiment, it is not an opinion. *Omnicare,* 575 U.S. at 176 (an "opinion conveys *only* an uncertain view as to that thing"). Moreover, the mere use of "I think" or "I believe" as part of longer actionable misrepresentations does not immunize a speaker from liability. *See id.* at 193; *Jaeger*, 644 F. Supp. 3d at 869. Defendants' authorities are distinguishable. *See Markette v. Xoma Corp.*, 2017 WL 4310759, at *2, *4 (N.D. Cal. Sep. 28, 2017) (statements concerned defendants' subjective descriptions of preliminary results of a clinical study that defendants "truly kn[e]w nothing" about until "the study [wa]s unblinded"); *Ng v. Berkeley Lights, Inc.*, 2024 WL 695699, at *7 n.5 (N.D. Cal. Feb. 20, 2024) ("[T]he challenged statements were prefaced with the words 'we believe[.]'").

[8] Defendants misstate *Align* prongs 2 and 3. MTD 7-8. An opinion is actionable if it contains an embedded untrue fact or if the omission of facts about the opinion's basis makes the overall statement misleading. *Align*, 856 F.3d at 615-16. Defendants' suggestion that *Stephens v. Maplebear Inc.*, 2025 WL 1359125, at *5 (N.D. Cal. May 9, 2025) required more (MTD 7) is inconsistent with *Align*.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

(E.D. Cal. 2025) (statement that defendant "expected" plant to create chemical by certain date actionable because it included false fact about the plan to create that chemical). Defendants' statements about European growth and performance (e.g., ¶¶125-26), strength in specific markets (e.g., ¶¶142-43), market fundamentals and customer demand (e.g., ¶146), and the causes of the demand decline (¶¶155, 157) also omitted facts about the existence and impact of market saturation, Chinese competition, and product and service problems on demand, giving investors a misleading impression about Enphase's European business (*see, e.g.*, ¶¶140, 153, 164). *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017) (statement that "FDA clearance risk has been achieved" misleading by omission when FDA had recently expressed concern about clearing product).[9]

Defendants assert that there are no embedded facts that were allegedly false and that the "opinion[s]" were "borne out by [Enphase's] financial results." MTD 7. But the AC sufficiently alleges false embedded facts (e.g., ¶¶164, 171) and Defendants' reliance on results fails for the same reason set forth in Section III.A.1. Defendants also improperly add a subjective falsity requirement to *Align* prong 3. MTD 8. As the Ninth Circuit recently confirmed, "[w]e consider what defendants knew and *when* they knew it under the scienter element of a securities action, not the falsity element." *Funko*, 2026 WL 292424, at *14. Defendants also cannot absolve themselves by pointing to insufficient risk disclosures that warned of "risks" that already had come to fruition (see *infra* Section III.A.4). *Forescout*, 63 F.4th at 781; *Berson*, 527 F.3d 982, 987-89. These disclosures implied that Enphase was not "presently experiencing those [risks]" and thus to the extent they addressed Enphase's demand issues "could have allayed [investor] concerns" "while serious [demand] problems bloomed." *Funko*, 2026 WL 292424, at *14.

### 3. The Statements Are Not Immaterial as a Matter of Law

Defendants' argument that 20 statements are puffery also fails. MTD 9. "[T]he exception for puffery is narrowly drawn," *S. Ferry LP # 2 v. Killinger*, 399 F. Supp. 2d 1121, 1129 (W.D. Wash. 2005), *vacated in part on other grounds*, 399 F. Supp. 2d 1121 (W.D. Wash. 2005), and courts must "examine the

---

[9] The statements also are actionable under the first *Align* prong because the AC alleges that the statements were objectively false (e.g., Enphase was losing share to competitors such that challenges did not stem solely from macroeconomic factors, (¶163) and subjectively false (e.g., Defendants knew that they were losing share) (¶¶190-217). Indeed, even if Defendants "sincerely believed" that "the fundamentals remain[ed] strong" (¶155), the alleged misrepresentations are still actionable because they "did not fairly align with the information" in Defendants' possession. *Forescout*, 63 F.4th at 771, 779.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

entire statement and its circumstances to determine if it is actionable," *Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). Here, the statements all concern Enphase's critical European division, a "core aspect of [Enphase's] business," *infra* Section III.B.3, and thus were not immaterial. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 66281, at *17 (N.D. Cal. Jan. 4, 2017) (rejecting puffery arguments). Many statements also concerned past or present market conditions Defendants purportedly gleaned from their much-touted efforts to analyze and track Enphase's European business. *E.g.*, ¶¶126, 129, 138 (Enphase "[w]as not seeing pricing pressure given its differentiated products[.]"), 146 ("The fundamental drivers aren't changing."), 173 ("The market stabilized during Q1[.]"), 177 ("Europe . . . ha[s] healthy growth vectors."). These are objectively verifiable facts, not vague expressions of corporate optimism. *See Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*, 2024 WL 4353049, at *6 (N.D. Cal. Sep. 30, 2024) ("specific and testable characteristic[s]" not puffery); *Jaeger*, 644 F. Supp. 3d at 873 (projections drawn from facts are not puffery).

While Defendants emphasize certain words—e.g., "strong" or "extremely bullish" (MTD 9), the puffery inquiry does not turn on individual words but the "context in which the statements were made." *Splunk*, 592 F. Supp. 3d at 941. Defendants provide no argument as to *how* the misstatements—which were issued on earnings calls describing the state of Enphase's critical European business, including in response to direct analyst questions—are immaterial *in context*.[10] *Forescout*, 63 F.4th at 770-71 (not puffery when "statements were made in response to specific questions asked by financial analysts"); *Meta*, 2024 WL 4353049, at *7 (discrediting puffery arguments pointing only to portions of statements while ignoring other portions stating concrete facts). In any event, even "general statements of optimism, when taken in context," are actionable where, as here, they "address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143; *see also In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *20 (N.D. Cal. Aug. 16, 2022) (Tigar, J.) (refusing to "conclude as a matter of law that a reasonable investor would have understood the phrases to which [d]efendants point as mere corporate optimism" because the allegations raised an "inference that [d]efendants were aware of

---

[10] Based on the context, the statements here more closely resemble the statements upheld in *Forescout* than Defendants' cited authorities (MTD 9). *See Forescout*, 63 F.4th at 759, 762, 770 (number of experienced sales representatives was "tracking very well" and the company had a "very large [sales] pipeline" not puffery because they "contravened the unflattering facts").

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

material adverse facts that cut against the positive representations"). At bottom, this "fact-intensive assessment[]" is "more properly left to the jury." *Mulligan*, 36 F. Supp. 3d at 966.

### 4.     The PSLRA Safe Harbor Does Not Protect Any Alleged Misstatement

For the PSLRA safe harbor to apply, statements must be forward looking. *Quality Sys.*, 865 F.3d at 1142. Many of Defendants' statements are "about current or past facts" or trends. *Id.*; *see, e.g.*, ¶125 ("***Our European business is growing rapidly***.").[11] Even if certain statements contain some forward-looking element, "the safe harbor is not designed to protect" defendants "when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *Quality Sys.*, 865 F.3d at 1142. "Such a statement does not fall under the safe harbor for forward-looking statements because its falsity lies not in the failure to predict the future, but in the implicit assertion about the present[.]" *Funko*, 2026 WL 292424, at *13. Here, multiple statements (¶¶126, 142-43, 146, 155-56, 166, 173, 175-76) are "separable—and actionable—non-forward-looking statements." *Id.* at *16. In all events, Defendants' statements are not "misleading because they failed to predict the future, but because they concealed or downplayed" current facts about Enphase's problems. *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1231 (N.D. Cal. 2009); *accord Funko*, 2026 WL 292424, at *12 ("[T]he relevant aspect of the risk disclosures [] is not their future prognoses, but [] their tendency to mislead investors" that "the risks identified had not yet occurred.").

Even for portions of statements that are forward looking, the safe harbor provides no protection where, as here, they were not "accompanied by meaningful cautionary statements" and were "made with actual knowledge that the statement was false or misleading." *Forescout*, 63 F.4th at 767. To be meaningful, cautionary language must "discredit the allegedly misleading statement so obviously that the risk of real deception drops to nil." *BioMarin Pharm.*, 2022 WL 164299, at *7. Cautionary language "must precisely and directly address the alleged misrepresentations." *QuantumScape*, 580 F. Supp. 3d at 737.[12] Here, Defendants' boilerplate warnings about "significant risks and uncertainties," competition, and

---

[11] *See Grossman v. Sin*, 2025 WL 1330087, at *30 (C.D. Cal. Mar. 31, 2025) ("we made tremendous progress" not forward-looking); *Forescout*, 63 F.4th at 774 (sales pipeline "continues to build to record levels" not forward-looking); *In re Twitter, Inc. Sec. Litig*, 2021 WL 4166725, at *3 (N.D. Cal. Sep. 14, 2021) (Tigar, J.) ("MAU trend has already turned around" not forward-looking).

[12] Moreover, for "mixed" statements, "it is likely that no cautionary language—short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be 'sufficiently meaningful' to qualify the statement for the safe harbor." *Quality Sys.*, 865 F.3d at 1146-47.

16                                   Case No. 4:24-cv-09038-JST
PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

"unfavorable macroeconomic and market conditions" (MTD 10)—none of which so much as mentioned Enphase's European business—were not "tailored" to the statements. *Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017). Regardless, Defendants' warnings that problems (like demand decreases) *could* occur are insufficient when, as here, such problems were *already* occurring. *Funko*, 2026 WL 292424, at *12.[13] Nor were Defendants' warnings about a slowdown in Europe, which they only made starting in October 2023, meaningful. MTD 10. To start, these disclosures cannot immunize the statements that predate them. In all events, the disclosures were themselves misleading because Defendants blamed a "broad macroeconomic" slowdown, concealing Enphase's systemic issues.[14] ¶157; *see Zaghian*, 675 F. App'x at 720 (cautionary language inadequate where it failed to warn of issues impacting company).

Finally, as explained below in Section III.B, Plaintiff alleges Defendants had no "reasonable basis" for their statements and were "aware of undisclosed facts tending seriously to undermine the statement's accuracy," which pleads actual knowledge. *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 972-73 (N.D. Cal. 2009); *see also Roberts*, 2020 WL 2042244, at *10.

## B.    Plaintiff Adequately Pleads a Strong Inference of Defendants' Scienter

Scienter is pled by alleging "intent to deceive, manipulate, or defraud" or "deliberate recklessness." *Schueneman*, 840 F.3d at 705. One "is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled on other grounds by Align*, 856 F.3d 605. The scienter of Enphase's executives, including Kothandaraman and European leadership, are attributed to Enphase. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 705 (9th Cir. 2021). The Court must assess "all of the facts alleged, taken collectively." *Reese*, 747 F.3d at 580. The scienter inference "need not be irrefutable, *i.e.*, of the smoking-gun genre."

---

[13] *See Forescout*, 63 F.4th at 781 (cautionary language insufficient where defendants were "aware of a significant likelihood that the risk would materialize and did not sufficiently apprise its investors of this development"); *Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *4 (N.D. Cal. Sep. 4, 2012) ("The safe harbor cannot protect cautionary statements made with superior knowledge that some of the potential perils identified have in fact been realized.").

[14] Defendants' cases (MTD 9-10) undercut their argument. In *Cutera* and *Fastly*, the defendants warned of facts the plaintiffs claimed were concealed—*Cutera* disclosed its dependence on sales force performance and retention, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010); *Fastly* repeatedly disclosed its heavy reliance on one customer, even naming the client, *In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *3-4 (N.D. Cal. Nov. 23, 2021).

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

*Tellabs*, 551 U.S. at 324. Rather, "it must be cogent and at least as compelling as any opposing inference." *Id*. at 314. "In other words, the tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014). The AC's allegations raise a strong inference of scienter.

### 1.    Defendants Knew or Recklessly Disregarded Contemporaneous Facts

"[P]articularized allegations that defendants had actual access to the disputed information raise a strong inference of scienter." *Quality Sys.*, 865 F.3d at 1145. Here, the AC details Defendants' knowledge of and actual access to contemporaneous facts that rendered their statements misleading including through (i) data and internal reports; (ii) internal meetings; and (iii) interactions with customers. *Reese*, 747 F.3d at 572 (scienter adequately alleged based on "data to which [defendant] had access").

**Data and Reports**. Kothandaraman publicly admitted that he had access to "internal reports" discussing the 2023 European "served available solar market." ¶¶191, 199 (Enphase "aggregat[ed]" third party reports). Kothandaraman also told investors that Enphase saw demand metrics for the Netherlands on at least "a weekly basis" (¶191) and that "every week, we monitor" activations, which can show "trend[s]" when combined with other data, such as bookings data, which was another "indicator[]" of future revenue (¶196). *See Quality Sys.*, 865 F.3d at 1145 (scienter where executives represented that they had access to sales information). FE-2 similarly reported that "sales data" (the "bulk" of which related to "sales quality") circulated at least quarterly and was available to Enphase employees in other European markets. ¶192. This data also was available through Salesforce, a centralized database accessible and available to Kothandaraman, which also housed "[s]ales reports and overviews of clients." *Id*. FE-2 reported that starting in the beginning of 2023, the Salesforce data showed that Enphase was losing market share. ¶69.

Enphase also closely managed its inventory channel, tracking "sell-in," "point of sales," and "sell-through." ¶211. Per Kothandaraman, Enphase had three to nine months of channel visibility. *Id*. Kothandaraman further admitted that Enphase's Solargraf application provided "us the entire visibility on" "the broad trends and broad strokes," "what happened in this particular region," and data concerning "leads versus contracts signed." ¶198; *see also* ¶207 (FE-3 confirmed access to database that reflected all Enphase installations across the Netherlands, France, and Belgium). Increased Solargraf coverage meant that, per Kothandaraman, "we have a lot more statistics" concerning installer demand. ¶198. Kothandaraman also touted Enphase's "huge customer service operation [] in France and in Germany" because it gave

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

Defendants access to data concerning how end-users viewed Enphase's products. ¶199. FE-1 confirmed that Enphase had excellent insight into demand because it tracked its sales to distributors, distributor sales to installers, and installer sales to customers. ¶213. Furthermore, an automated ERP system provided detailed reporting of this data, which also included installation and shipment data. ¶213. Given the accessibility of this internal data, Defendants would have received all materially adverse information regarding declining demand and related structural issues that undercut their statements about Enphase's European business. *See* Section III.A.1; *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 940, 946 (9th Cir. 2023) (CEO's scienter alleged based on "detailed sale reports prepared for him" that "would have shown" falsity), *cert. dismissed as improvidently granted*, 604 U.S. 20 (2024).

**Internal Meetings**. Kothandaraman and other Enphase executives (including FE-1) attended weekly Europe sales review meetings. ¶193. Kothandaraman confirmed this, stating "[w]e have [] very meticulous meeting[s]" that "review" "point of sales in Europe by country, by distributor" "every week." ¶191. At these meetings, country heads presented data reflecting distributors' sales to installers, which reflected the relative strength of Enphase sales out of the channel, and Kothandaraman and others discussed actual versus forecasted shipments for each region. ¶193. At a summer 2023 meeting, FE-1 notified Kothandaraman of declining demand in his region. ¶194.[15] *See Fastly*, 801 F. Supp. 3d at 913-14 (scienter pled when usage and revenue declines were discussed with defendants at all-hands meetings).[16]

Enphase's C-Suite, including Kothandaraman, also attended monthly R6Q Meetings at which each European country or region presented six quarters of detailed sales data, key metrics, and forecasts. ¶195. FE-1 recalled that at these meetings Kothandaraman emphasized the number of Enphase installers in each country. *Id*. FE-1 confirmed that data presented at these meetings showed demand for Enphase's products had fallen below forecasts and that "leadership knew the delta and demand change." *Id*. FE-1 also recalled

---

[15] Defendants' contention that the FE accounts are unreliable (MTD 17-20) fails for the reasons provided in Section III.A.1 and because the FE accounts are corroborated by Kothandaraman's public statements.
[16] Defendants claim that scienter is undercut because Kothandaraman's volatile behavior in response to hearing about demand decreases led sales directors to optimistically present results. MTD 18. This falls flat. For one, the FE accounts demonstrate that *despite* Kothandaraman's attempt to instill fear, executives *still called out* declining demand in meetings, consistent with the data available to Kothandaraman. ¶72. For another, this is not the behavior of an executive interested in "laudable candor," as Defendants suggest (MTD 1), but recklessness, as in *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b-5").

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

that European overstocking was discussed at RQ6 meetings. ¶214. *Funko*, 2026 WL 292424, at *20 (executive discussion of inventory management project at meetings supported scienter).

Kothandaraman also publicly touted "[o]ur weekly ship review," at which a graph reflected Enphase's sell-through and sell-in against its "guardrail[]" of 8-10 weeks of inventory. ¶212. This process identified which "installers aren't doing enough volume" so the "[s]ales guys are focused on the right things versus pushing [] stuff into the channel." ¶212. FE-1 confirmed that Enphase shipment and distributor sales data was reported and discussed at weekly shipment review meetings attended by Kothandaraman and European sales directors. ¶213. FE-1 also recalled that despite evidence of weakening demand in the spring and early summer of 2023, Enphase continued to push shipments to distributors, leading distributors in FE-1's region to push back. ¶214. *Funko*, 2026 WL 292424, at *20 (executive leadership attendance at bi-weekly meetings supported scienter inference).[17]

**Customer Interactions**. Kothandaraman touted his frequent discussions with European distributors and installers. ¶200. In a February 2023 call, Kothandaraman stated that "[w]e do have good visibility" in Europe, in part due to visits with distributors and installers. ¶201. In July 2023, Kothandaraman admitted "hav[ing] a lot of robust discussions with" and "hearing" from customers about demand trends—discussions Kothandaraman confirmed Enphase "doubl[ed] down on" after October 2023. ¶202. Enphase "listen[ed] to [its] installers" and "manag[ed] inventory" with its distributors and installers. ¶203. Kothandaraman also visited the Netherlands and met with "leading installers" two weeks before the 2Q23 and 3Q23 calls and hosted a Solar Next event for "800-plus installers" before the 4Q23/FY23 call. ¶204 (FE-2 confirmed Kothandaraman visited the Netherlands twice).

Because of Kothandaraman's frequent interactions with installers, he "would have seen first-hand the issues that were emerging" in Europe, *Funko*, 2026 WL 292424, at *20, including declining demand due to, as FE-1, FE-2, and FE-3 relayed, cheaper Chinese competition, and the implications this had for Enphase's business, ¶¶205-06, 208, 210.[18] Kothandaraman also knew or was reckless in not knowing that, per FE-2 and FE-3, in early 2023 and by summer, distributors had ordered less product and installations

---

[17] Kothandaraman further admitted that Enphase closely managed microinverter pricing and tracked its competition. ¶¶215-16. According to FE-1, Enphase held pricing meetings at which Enphase country sales directors more frequently requested price flexibility. ¶217

[18] Plaintiff's allegations about the impact from Chinese competition are thus not "unmoored in time" (MTD 19). *See* ¶81 (first half 2023); ¶82 (August or September 2023); ¶83 (late 2023); ¶88 (February 2024).

20                                                    Case No. 4:24-cv-09038-JST
PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

had declined. ¶¶206-09 (FE-3's mid-2023 installer conversations confirmed Enphase's problematic installations led to lost sales), 210 (FE-3 heard from Dutch installers about saturated market); *Funko*, 2026 WL 292424, at *19 (COO efforts to oversee project personally supported a strong inference of scienter).[19]

These particularized facts are sufficient to allege scienter and belie Defendants' argument that the AC does not indicate what Defendants actually reviewed.[20] MTD 19.

### 2.    Defendants' Frequent Statements Supports Scienter

The scienter inference is further strengthened by the fact that Defendants repeatedly spoke about Enphase's European business and represented that they "had all of the information necessary" to provide accurate information, which, "[i]f [they] did not in fact have such knowledge, [] would be at least actionably reckless." *S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009).[21] Kothandaraman repeatedly emphasized his detailed knowledge of European markets (*supra* Section III.B.1), making it "unlikely that []he was not aware" of contradictory information. *Reese*, 747 F.3d at 572.[22] Supporting this inference, FE-2 explained that (i) Kothandaraman was a very hands-on CEO; and (ii) knew a lot about the European market and the sales data. ¶221; *NVIDIA*, 81 F.4th 918 at 946 (CEO's "detail-oriented management style" meant there was an inference he was "aware of" source of "a billion dollars" in revenue over 15-18 months). Thus, Plaintiff does not merely rely on Defendants' "general awareness of [Enphase's] day-to-day workings" (or "role" at Enphase) as Defendants claim. MTD 22.

### 3.    Enphase's European Business Was a Core Operation

"The core operations doctrine is 'a scienter theory that infers that facts critical to a business's core operations . . . are known to a company's key officers." *Funko*, 2026 WL 292424, at *17 (quoting *In re*

---

[19] The AC alleges more than a close customer relationship (MTD 21); it alleges what customers were saying about demand, competition, and Enphase's products (¶¶200-10).

[20] Contrary to Defendants' assertion (MTD 22), allegations about management's role "may independently satisfy the PSLRA where," as here, "they are particular and suggest that defendants had actual access to the disputed information," *S. Ferry LP #2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008).

[21] This applies with force here given Defendants' statements in response to analyst inquiries. ¶¶129, 145-46, 158-59, 166; *see In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) (inferring scienter where defendants "issued specific denials" to analyst questions); *In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017) (scienter pled where analysts' speculation about inventory buildup incentivized defendants "to seek out or pay attention to such information").

[22] Defendants' claim that they had no scienter because they purportedly "updated investors" "when macroeconomic tides changed" ignores the AC's well-pled allegations, and cannot be squared with the *Tellabs* inquiry. 551 U.S. at 326-27 (court must conduct a "comparative assessment of plausible inferences, *while constantly assuming the plaintiff's allegations to be true*"); *Alphabet*, 1 F.4th at 698 ("court should assume [] veracity" of well-pled allegations); *Supra* Sections III.A.1, III.B.1.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

*NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014)). Core operations allegations can support a strong inference as part of the court's holistic review. *Id.* Moreover, even when there are no particularized facts that defendants knew about contrary information, if "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter," scienter is inferred. *Id.*; *see also Berson*, 527 F.3d at 987-88 (scienter inferred even though plaintiffs did not allege that defendants knew about stop-work orders).[23]

Here, because Europe was critical to Enphase's growth and its stock price in the face of a declining U.S. business (¶¶219-20), "a reasonable trier of fact could find that [Defendants] must have known about" declining demand, market saturation, market share losses to lower-priced Chinese competition, and product struggles in Europe. *Funko,* 2026 WL 292424, at *18 (inventory management "essential to Funko's ability" "to grow as a business"). Indeed, Defendants frequently discussed the European market on conference calls, exhaustively detailing all the ways in which Enphase managed that business, including hands-on management from Kothandaraman. *See* Sections III.A.1, III.B.1-2; *Funko*, 2026 WL 292424, at *18 (Funko's admissions regarding importance of inventory management support core operations inference). Defendants also attended frequent meetings and personally met and interacted with customers to understand trends within the European market. *See* Section III.B.1; *Funko*, 2026 WL 292424, at *19-20. Thus, these facts coupled with the FEs' accounts of Defendants' access to information about declining demand, market saturation, Chinese competition, and product issues in Europe demonstrate that this business (and its growth) "were viewed as central priorities by [Enphase's] executive leadership" and that it was "strongly likely" that Enphase employees and customers "would have shared information" with Defendants regarding Enphase's European markets. *Funko*, 2026 WL 292424, at *19-20. Thus, the AC's allegations provide "a narrative that strongly points to the existence of scienter." *Id.* at *20.[24]

---

[23] Courts have rejected Defendants' contention that a complaint must detail the precise numbers Defendants reviewed (MTD 19). *See Robb v. Fitbit Inc.*, 2017 WL 219673, at *8 (N.D. Cal. Jan. 19, 2017) (rejecting argument that the "precise level of inaccuracy" of reports was required because such arguments are "evaluated" at "summary judgment"); *In re Intuitive Surgical Sec. Litig.*, 2014 WL 7146215, at *5 (N.D. Cal. Dec. 15, 2014) (the Ninth Circuit "does not appear to require the contents of the report to be alleged").

[24] The core operations inference also extends to Belur, Enphase's Chief Products Officer, who was responsible for the Company's products and repeatedly discussed Enphase's competitive standing in Europe during the Class Period. ¶¶28, 128, 145. Moreover, Kothandaraman's statements describing access to market intelligence attributed that knowledge to Enphase's senior leadership, which included Belur. ¶¶191, 196, 198-204. Thus, the AC does not rely on group pleading. MTD 17 n.3.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

#### 4.    Plaintiff's Inference Is Stronger

While these facts alone raise a strong inference of scienter, "the totality of the circumstances under the *Tellabs* analysis makes the inference irresistible." *Reese*, 747 F.3d at 577. The direct evidence of scienter together with Kothandaraman's emphatic representations of granular, real-time knowledge about a core operation of Enphase sufficiently plead that Defendants knowingly or recklessly "withheld important warning signs from the market." *BioMarin Pharm.*, 2022 WL 164299, at *14. Moreover, the nature of what Defendants concealed—that Enphase was losing significant share due to structural challenges—would have eviscerated Enphase's value proposition and if Defendants had disclosed this reality, their European growth story would have collapsed. ¶¶2, 43, 79-88; *see also Funko*, 2026 WL 292424, at *18-20.[25] Their concealment of these facts across multiple quarters, even after direct warnings, supports deliberate recklessness at a minimum. *See In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *13 n.12 (N.D. Cal. Nov. 4, 2020) ("[H]ope . . . does not justify misleading investors.").

Defendants' central counter-inference rests on the purported lack of financial motivation to commit fraud. MTD 17. However, "[a]llegations of suspicious stock sales . . . are not needed." *Alphabet*, 1 F.4th at 707. And where, as here, a plaintiff alleges "compelling and particularized facts showing [defendant's] deliberate recklessness," the lack of an alleged motive "will not prevent the plaintiff from meeting its [scienter pleading] burden." *Fastly*, 801 F. Supp. 3d at 914.

### C.    Plaintiff Adequately Alleges Loss Causation

To plead loss causation, a complaint need only provide "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). This standard "should not prove burdensome." *Id*. Loss causation "requires no more than the familiar test for proximate cause." *First Solar*, 881 F.3d at 753. Notably, "loss causation is a context-dependent inquiry" and there are an "infinite variety of causation theories a plaintiff might allege to satisfy proximate cause." *Id*. at 753-54. Allegations of "a causal connection between the fraud and the loss" suffice. *Id*. at 753. Finally, a disclosure need not reveal fraud or admit statements were false: "Disclosure of the fraud is not a sine qua non of loss causation, which *may be shown even where the alleged fraud is not necessarily*

---

[25] Defendants' argument that they "simply miscalculated the demand for a new product," *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. 2017), fails based on the AC's allegations.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

*revealed prior to the economic loss.*" *Id.*

Here, Defendants' misstatements concealed significant demand problems in Europe. The relevant truth concealed by these statements was revealed through two disclosures. *First*, on October 26, 2023, Enphase disclosed that European revenue had fallen due to "softening in demand." ¶¶14, 101, 235. Defendants also revealed that Enphase had overfilled its channel beyond true demand, and would need to do an "inventory correction" that resulted in lower guidance for the next two quarters. ¶¶14, 102, 178, 237, 251. On this news, Enphase's stock fell nearly 15%. ¶¶14, 241. *Second*, on October 22, 2024, Defendants revealed that, contrary to prior statements suggesting that demand problems were temporary, Enphase's European revenue had decreased by 15%, and it expected a "continued slowdown in Europe" that resulted in lower guidance. ¶¶18, 254-56. On this news, Enphase's stock fell nearly 15%. ¶¶19, 257. This suffices to allege a "causal connection between the fraud and the loss." *First Solar*, 881 F.3d at 753.

Defendants' arguments to the contrary are meritless. *First*, Defendants argue that "disappointing earnings, without more, do not suggest fraud." MTD 24-25. But Ninth Circuit law is clear that a disclosure of an earnings miss need not reveal fraud to be corrective: "A plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *First Solar*, 881 F.3d 750, 754.[26] Plaintiff need only plead a "causal connection between the fraud and the loss," *First Solar*, 881 F.3d at 753, which it does here— alleging that the very facts Defendants concealed—demand issues in Enphase's European business— caused the revenue shortfalls and resulting stock declines. *See City of Mia. Gen. Emps' & Sanitation Emps' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1046 (N.D. Cal. 2018) (corrective disclosure "need not be a 'mirror image' disclosure—a direct admission that a previous statement is untrue" but instead "must simply relate to the same subject matter" as misstatement).

*Second*, Defendants claim guidance reductions were not corrective because they were a "prediction of future headwinds" rather than any "retrospective analysis." MTD 24. This argument cannot be squared with the facts or the law. To start, as discussed above, the disclosures included guidance reductions *and*

---

[26] *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014), is not to the contrary. MTD 24. Rather, as the Ninth Circuit explained in *First Solar*, the *Loos* plaintiff pled "a causation theory based on market revelation of the fraud" such that the courts "naturally evaluate[d] whether plaintiffs have pleaded or proved the facts relevant to their theory." 881 F.3d at 754. Here, Plaintiff did not explicitly plead that the "fraud was revealed to the market," and so the standard applied in *Loos* is not applicable. *Id.*

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

past revenue declines. Moreover, Enphase blamed the guidance reductions on already existing problems, rather than predictions of future headwinds.[27] More fundamentally, the law is clear that a disclosure of lowered guidance satisfies loss causation, even where it does not reveal fraud. *See, e.g.*, *Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978, 991 (D. Ariz. 2015) (denying summary judgment on causation for disclosures including lowered guidance, even where defendants did not disclose that lowered guidance resulted from concealed issues, explaining that "even if the market does not learn that the company lied," if "the company's revenues fail to meet projections because of" "the very fact misrepresented" and "the stock loses value as a result, the misrepresented fact has led to the plaintiff's loss"), *aff'd*, 881 F.3d 750.

*Third*, Defendants' argument that the October 2024 disclosure revealed no "new facts" because Defendants did not specifically cite structural problems (MTD 25) fares no better. Disclosures "need not precisely mirror the earlier misrepresentation." *BofI*, 977 F.3d at 790. Regardless, Plaintiff alleges that Enphase's structural issues in Europe caused the October 2024 disclosure, and analysts understood the same. *See, e.g.*, ¶122 (analyst writing that Defendants' explanations were "unconvincing" because "actual demand rarely changes so quickly" and in reality, the issue was structural: Enphase "is losing share to Chinese competitors who are willing to sell at less than half [Enphase's] level."); ¶120 (analyst reporting that there were "structural problems" in Enphase's business "that will continue to pressure margins," including "competition from . . . China's players").

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied. Should the Court grant any portion of the Motion, Plaintiff requests leave to amend.[28] *See Eminence Cap., L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003) (leave to amend should be granted "with extreme liberality" and is "especially important in the context of the PSLRA").

---

[27] The October 2023 guidance reduction resulted from a *previous* demand decrease that caused Enphase to overfill its channel (¶¶14, 237), and the October 2024 guidance reduction resulted from a "*continued* slowdown in Europe" (¶¶18, 254). Defendants' authorities are inapposite (MTD 24): *Plumbers & Steamfitters Loc. 60 Pension Tr. v. Meta Platforms, Inc.*, 2024 WL 4251896, *10 (N.D. Cal. Sep. 17, 2024) (disclosure was purely a "prediction" that Meta "would experience headwinds"); *Ng*, 2024 WL 695699, at *18 (disclosure concerned a CEO departure, not earnings guidance); and *Dolly v. GitLab Inc.*, 2025 WL 2372965, at *15 (N.D. Cal. Aug. 14, 2025), ("only new information" disclosed was the completion of previously disclosed analysis).

[28] Although Defendants claim this is the third filed complaint (MTD 25), this is Defendants' first motion to dismiss and thus the first time the Court is considering the merits of Plaintiff's claims.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT

Dated: February 10, 2026

Respectfully submitted,

**KESSLER TOPAZ MELTZER
   & CHECK, LLP**

*/s/Jennifer L. Joost*
JENNIFER L. JOOST (Bar No. 296164)
(jjoost@ktmc.com)
STACEY M. KAPLAN (Bar No. 241989)
(skaplan@ktmc.com)
BENNETT CHO-SMITH (Bar No. 358260)
(bcho-Smith@ktmc.com)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:   (415) 400-3000
Fax:   (415) 400-3001

-and-

NATHANIEL C. SIMON*
(nsimon@ktmc.com)
RYAN SHELTON-BENSON*
(rsheltonbenson@ktmc.com)
280 King of Prussia Road
Radnor, PA 19087
Tel:   (610) 667-7706
Fax:   (610) 667-7056

*Counsel for Lead Plaintiff HANSAINVEST Hanseatische Investment-GmbH and Lead Counsel for the Putative Class*

*appearance pro hac vice*