UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

HANSAINVEST HANSEATISCHE INVESTMENT-GMBH,

Plaintiff,

v.

ENPHASE ENERGY, INC., et al.,

Defendants.

Case No. 24-cv-09038-JST

**ORDER GRANTING MOTION TO DISMISS**

Re: ECF No. 86

Before the Court is Defendants' motion to dismiss the Amended Consolidated Complaint ("AC"). ECF No. 86. The Court will grant the motion.

## I. BACKGROUND

### A. Overview of Facts Alleged in the AC

For the purpose of resolving the present motion, the Court accepts as true the factual allegations in the AC, ECF No. 85.

Lead Plaintiff HANSAINVEST Hanseatische Investment-GmbH ("Plaintiff") brings this securities fraud proposed class action on behalf of shareholders who purchased or otherwise acquired common stock of Enphase Energy, Inc. ("Enphase" or "the company") between April 25, 2023, and October 22, 2024 ("Class Period"). They assert claims against Defendant Enphase and Individual Defendants Badrinarayanan Kothandaraman (Enphase's President and Chief Executive Officer during the Class Period) and Raghuveer Belur (Enphase's Senior Vice President and Chief Products Officer during the Class Period) for violations of Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b−5(b).

Enphase designs, manufactures, and sells solar microinverters used primarily in residential

solar installations. *Id.* ¶ 2. Unlike traditional string inverters that connect an entire array of solar panels to a single inverter, microinverters are installed on each individual panel, providing certain performance advantages but at a higher price point than string inverters. *Id.* Enphase positioned its microinverters as a premium product, charging prices that were often double or triple those of string inverter competitors. *Id.* Although Enphase sold other products besides microinverters, sales of microinverters made up the majority of its revenues during the Class Period, with analysts estimating that microinverter sales accounted for about 83% of Enphase's total revenues in the fiscal year prior to the start of the Class Period. *Id.* ¶ 46.

When selling its microinverters to customers during the Class Period, Enphase primarily operated a three-tiered supply chain system. *Id.* ¶ 44. Specifically, Enphase sold its microinverters to solar distributors, and distributors then combined Enphase's microinverters with other products necessary to create PV arrays and resold the combined product to installers. *Id.* The installers then executed installation contracts with residential end-users to install the combined product in their homes. *Id.* In some instances, Enphase also operated a two-tiered supply chain system, selling directly to certain large installers, which then installed the microinverters in the homes of end-users. *See id.* Enphase recognized the revenue from its sales when it shipped product to its distributors and large installers. *Id.* ¶ 45. The company closely tracked the "sell-through" of its products from distributors to installers, as that was a "meaningful representation of [] business trends" and of true demand for its products. *Id.* ¶ 45.

In early 2023, it became critical for the company to expand in Europe because its business in the United States was declining. *Id.* ¶¶ 3, 53, 58. During the Class Period, the company's international revenue, inclusive of Europe, grew to account for more than 35% of its total revenues. *Id.* Enphase's three largest markets in Europe during the Class Period were the Netherlands, France, and Germany, with additional notable sales volume in Spain and Portugal. *Id.* ¶ 52. Plaintiff does not allege what percentage of Enphase's overall European revenues corresponded to each of those markets, however. *See id.*

By no later than the spring of 2023, the company's business in Europe was experiencing "severe structural problems," namely that the residential solar market in "key European countries"

had become saturated; that the company was actively losing business to competitors who were selling comparable products at 50% lower prices; and that Enphase was experiencing issues related to its customer service and product quality, which were leading installers to choose competing products. *See id.* ¶¶ 4–5, 68. Plaintiff alleges that Defendants knew of these structural problems and nevertheless made false and misleading statements to investors beginning in April 2023 and throughout the Class Period that led investors to believe, incorrectly, that Enphase's business in Europe was thriving, and that any weaknesses in Europe were temporary and would reverse in the near-term. *See id.* ¶¶ 11, 68.

Plaintiff alleges that the "truth began to emerge" after the market closed on October 26, 2023, when Enphase disclosed: (1) that its revenue in Europe had decreased approximately 34% compared to the previous quarter; (2) that its revenue guidance for the following quarter would be only $300–$350 million; and (3) that it would need to effectuate a $150 million "channel inventory correction in the U.S. and Europe" in 4Q 2023 and a similar correction in 1Q 2024. *See id.* ¶ 14. Enphase's stock price fell nearly 15% on these disclosures. *See id.*

Enphase's stock price remained artificially inflated despite these revelations, however, because Defendant Kothandaraman characterized the company's problems as temporary, reassured investors that the company's fundamentals remained strong, and failed to disclose that the poor results had been caused at least in part by "long-term underlying problems" impacting the company's European business. *See id.* ¶ 15.

The truth was finally revealed to investors after the market closed on October 22, 2024, when Enphase announced its financial results for Q3 2024 and disclosed that its revenue in Europe had decreased 15% relative to the prior quarter, and that there would be a continued slowdown in Europe in Q4 2024. *See id.* ¶ 18. Enphase's stock price fell nearly 15% on this news. *Id.* ¶ 19.

**B. Procedural History**

This action was filed on December 13, 2024, by Trustees of the Welfare and Pension Funds of Local 464A–Pension Fund. ECF No. 1. On August 20, 2025, the Court appointed Plaintiff as Lead Plaintiff and Kessler Topaz Metzler & Check, LLP, as Lead Counsel. ECF No. 63.

Plaintiff filed the AC on November 5, 2025. ECF No. 85. The present motion to dismiss followed, which Plaintiff opposes. *See* ECF No. 86 (Mot.); ECF No. 90 (Opp'n.); ECF No. 92 (Reply).

## II. REQUEST FOR JUDICIAL NOTICE OR INCORPORATION BY REFERENCE

Federal Rule of Evidence 201 permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)–(2). "Accordingly, '[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment[,]" but a "court cannot take judicial notice of disputed facts contained in such public records." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (citation omitted).

The incorporation-by-reference doctrine permits a court to "treat[] certain documents as though they are part of the complaint itself" if "the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.* at 1002 (citation and internal quotation marks omitted). While a court may assume the truth of an incorporated document's contents for the purpose of resolving a motion to dismiss under Rule 12(b)(6), "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* at 1003.

Defendants request that the Court take judicial notice of or consider under the incorporation-by-reference doctrine 23 exhibits (Exhibits 1 through 23). ECF No. 88. These exhibits are copies of Enphase's SEC filings, transcripts of calls with investors, copies of Enphase's stock price history, and a copy of a publicly available report by third-party analyst Oppenheimer & Co., Inc. *See id.* at 3–4.

Plaintiff does not oppose the request to the extent that the Court considers the exhibits at issue only for the purpose of showing that a statement was made to the market or that Enphase reported certain figures. *See* ECF No. 91 at 4–6.

Because Plaintiff does not dispute their authenticity and accuracy, the Court grants

United States District Court
Northern District of California

Defendants' request for judicial notice of Exhibits 1 through 23. The Court will take judicial notice of the statements in these exhibits for the purpose of determining what information was available to the market, but not for the truth of the matters asserted therein or for the purpose of resolving factual disputes. *See Khoja*, 899 F.3d at 999–1001; *see also Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (holding that the district court properly took judicial notice of publicly available financial documents, SEC filings, and reported stock price history); *Wochos v. Tesla, Inc.*, No. 17-CV-05828-CRB, 2018 WL 4076437, at *2 (N.D. Cal. Aug. 27, 2018) (taking judicial notice of earnings call transcript "for the sole purpose of determining what representations [defendants] made to the market").

## III. JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## IV. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While this standard is not a probability requirement, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks and citation omitted). In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

A complaint that sounds in fraud must satisfy the requirements of Rule 9(b). Additionally, "[i]f a claim alleges securities fraud, the Private Securities Litigation Reform Act ('PSLRA'), 15 U.S.C. § 78u–4, also applies." *Khoja*, 899 F.3d at 1008.

## V. DISCUSSION

Defendants move to dismiss (1) Plaintiff's claim under Section 10(b) and Rule 10b–5 for failure to allege falsity, scienter, and loss causation with respect to 26 challenged statements; and

(2) Plaintiff's claim under Section 20(a) on the ground that no primary violation of Section 10(b) or Rule 10b–5 has been plausibly alleged. ECF No. 86.

**A. Claims under Section 10(b) of the Exchange Act and Rule 10b−5**

Section 10(b) of the Exchange Act declares it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary." 15 U.S.C. § 78j(b). "SEC Rule 10b–5 implements [Section 10(b)] by making it unlawful to . . . 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. § 240.10b–5). "Thus, to prevail on a claim for violations of either Section 10(b) or Rule 10b–5, a plaintiff must prove six elements: (1) a material misrepresentation or omission by the defendant [falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051–52 (9th Cir. 2014) (citation and internal quotation marks omitted).

**1. Material Misrepresentation or Omission (Falsity)**

The first element of a claim under Section 10(b) and Rule 10b–5(b) requires a plaintiff to show that the defendant made a statement that was false or misleading as to a material fact. *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). This requires, in relevant part, "specify[ing] each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. § 78u–4(b)(1)). "In setting forth the reasons why they contend that each challenged statement is misleading, securities plaintiffs may rely on either an affirmative misrepresentation theory or an omission theory." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (citation omitted). "[A]n affirmative misrepresentation is an 'untrue statement of a material fact,' and a fraudulent omission is a failure to 'state a material fact necessary in order to make the

United States District Court
Northern District of California

statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* (citation omitted).

"Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at 1008 (citation omitted). "Even if a statement is not false, it may be misleading if it omits material information." *Id.* at 1008–09 (citation omitted). Information is material if "a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). "[T]o be actionable under the securities laws, an omission must be misleading . . . it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (citation and internal quotation marks omitted). "Disclosure [of omitted information] is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b–5(b)). To determine whether a statement is misleading, courts "look at the context surrounding the statement," such as the "surrounding text, including hedges, disclaimers, and apparently conflicting information." *See Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1131 (9th Cir. 2025) (citations and internal quotation marks omitted).

**a. Statements of Opinion**

Defendants argue that, with the exception of Statement 7[1], all challenged statements are statements of opinion subject to the pleading standards of *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015) ("*Omnicare*") because they reflect Defendants' subjective judgments about Enphase's prospects or performance in Europe. *See* ECF No. 86 at 14. Defendants further contend that Plaintiff has not plausibly alleged that any opinion statement is false under *Omnicare*'s pleading standards.

[1] The statement numbers attributed to each challenged statement are based on those used in Defendants' motion to dismiss, as well as the chart attached to their motion as Appendix A, *see* ECF No. 86–1.

Plaintiff responds that (1) the challenged statements at issue are not statements of opinion because they express certainty about a thing and do not include phrases such as "I think" or "I believe"; and (2) even if the statements at issue were opinion statements, they are plausibly false under *Omnicare*'s pleading standards.

**i. Whether the Challenged Statements Are Statements of Opinion**

A statement of opinion is one that expresses "a belief, a view, or a sentiment which the mind forms of persons or things." *See Omnicare*, 575 U.S. at 183 (citations, internal quotation marks, and alterations omitted). By contrast, a statement of fact is "a thing done or existing or an actual happening." *Id.* (citation, internal quotation marks, and alteration omitted). Thus, "a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Id.* Some statements of opinion may contain "embedded statements of fact." *See id.* at 185. For example, the opinion statement "I believe our TVs have the highest resolution available because we use a patented technology to which our competitors do not have access" contains "an underlying fact: that the company uses a patented technology." *See id.* Statements of opinion containing an embedded statement of fact are treated as opinion statements under *Omnicare*. *See id.*

The Court finds that Statement 15 is not an opinion statement because it expresses certainty about a thing as opposed to a belief, a view, or a sentiment. *See* Statement 15, AC ¶ 157 ("*In Europe, it is due to broad macroeconomic conditions*.").[2]

The Court finds that the remaining 24 challenged statements at issue, which are listed below, are statements of opinion because they express a belief, a view, or a sentiment about the company's current or future position or performance in Europe, or about its competitive strengths. *See Markette v. XOMA Corp.*, No. 15-CV-03425-HSG, 2017 WL 4310759, at *4 (N.D. Cal. Sept. 28, 2017) (holding that challenged statements were opinion statements because they "reflect the speaker's assessment of and judgment about the underlying circumstances").

- Statement 1, AC ¶ 125 ("*Our European business is growing rapidly*").

[2] All challenged statements are italicized throughout this order.

- Statement 2, AC ¶ 126 (“*Our European business is doing very well.* [ . . .] *Our business is growing much faster than the market.”*).
- Statement 3, AC ¶ 127 (“With the residential solar and storage markets growing rapidly in Europe, *we are in a great position to significantly accelerate our business*.”).
- Statement 4, AC ¶ 128 (Enphase “*manage[d]*” or “*deal[t]*” “*with [its] competition*” with “*it’s highly differentiated products, high-reliability products and great customer experience*”).
- Statement 5, AC ¶ 129 (“*[G]iven our differentiated solution, our reliability, customer service, et cetera, we compete very effectively. So I don’t think that environment has changed*, if I understood your question correctly”).
- Statement 6, AC ¶ 130 (“*[O]ur Europe business is doing incredibly well*. [ . . . ] And so *Europe is doing incredibly well for us*.”).
- Statement 8, AC ¶ 142 (*“Our European business remained strong*. Q3 is typically down due to summer vacation, but *our year-on-year growth trend is very robust*. . . . *We saw strong broad-based growth across Europe in Q2. Netherlands* and France *continue to be very strong for us. We are starting to gain real traction in Germany in* both *residential solar* and batteries. . . . *We saw strong quarterly sequential growth in installer count, sell-through and* activations of both *solar* and batteries *in Germany during Q2*.”).
- Statement 9, AC ¶ 143 (“*[W]e are very strong in Netherlands* and France. [ . . . ] And so *we are extremely bullish on Europe*.”).
- Statement 10, AC ¶ 144 (“*In Europe, on microinverters* [ . . . ] For small systems like in Netherlands and France, *they love our quality, they love our service,* and we are extremely close to these partners. *We provide them an outstanding service*.”).
- Statement 11, AC ¶ 145 (“*[W]e are definitely doing well in Germany as well, both – not just for solar, but solar* and battery.”).
- Statement 12, AC ¶ 146 (“Well, *that’s what we are hearing.* [ . . . ] *This is what we are hearing from all of them. The fundamental drivers aren’t changing*. And for us, really, like what I said, *we aren’t that much worried about talks of inventory because* we have -- we are underpenetrated in Europe. *We are strong in* France and *Netherlands*. [ . . . ] So we are underpenetrated in most of the regions, except France and *Netherlands, which have been fantastic for us*. And so I think *we are extremely bullish about Europe. Our growth rate, like what we said, is more than triple growth in Q2, more than tripled year-on- year. We are very bullish there.*”).
- Statement 13, AC ¶ 155 (“Despite this temporary weakness, *we think that the pullback in Europe will be temporary as the fundamentals remain strong* and we are relatively underpenetrated in the U.S. We are entering a lot -- lots of new geographies with our IQ8 microinverters and batteries. So *we remain very bullish about Europe*.”)
- Statement 14, AC ¶ 156 (“I visited with our leading installers, [and] *I came away confident that this pullback will be short lived.* [ . . . ] *We are well positioned to take advantage of these changes.* [ . . . ] In Germany, our Q3 sell-through was

United States District Court
Northern District of California

down 32% compared to Q2. *We saw strong sequential growth in installer count and activations, and we are continuing to gain traction there.*").

- Statement 16, AC ¶ 158 ("*Netherlands situation is actually not so bad*. [ . . . ] And so *it's actually extremely good for us there.*").
- Statement 17, AC ¶ 159 (Defendant Kothandaraman confirmed that Enphase had "*a lot of levers*" for growth).
- Statement 18, AC ¶ 166 ("*We are seeing Europe starting to pick back up*. [. . .] *We are seeing Netherlands* [ . . . ] *we see incremental progress on a weekly basis*.").
- Statement 19, AC ¶ 167 (Defendant Kothandaraman stated that "in [the] Netherlands" "*we saw the bottom*" and that "*the bottom, I think is behind us*").
- Statement 20, AC ¶ 173 ("*The market stabilized during Q1, and we are encouraged by the demand signals we see* after seeing the government's decision to support NEM for the foreseeable future. [. . .] In Germany, our overall sell-through in Q1 was up 28% compared to Q4. *We are going from strength to strength in this market*.").
- Statement 21, AC ¶ 174 ("*Europe has already begun to recover*.").
- Statement 22, AC ¶ 175 ("*We expect Europe . . . to continuously improve*." "*We are starting to see the lead generation much higher in Netherlands*." "So we are cautiously optimistic that *things are turning. And that's why I said Q1 is the bottom quarter*" and "*with these growth trends*, we expect sell-through to continuously go up.").
- Statement 23, AC ¶ 176 ("*[W]e are growing* [ . . . ] We talked about [the] Netherlands, we talked about France, we talked about Germany, *we are extremely bullish there*.").
- Statement 24, AC ¶ 177 ("*Europe . . . ha[s] healthy growth vectors*. We do expect 50-50 from North America and Europe.").
- Statement 25, AC ¶ 185 ("*I made a statement in my prepared remarks that we are strong in France, strong in Netherlands with strong in Germany*.").
- Statement 26, AC ¶ 186 ("*We are very strong in Netherlands, strong in France, we're strong in Germany*.").

Plaintiff argues that a statement cannot be a statement of opinion unless it is accompanied by phrases such as "I think" or "I believe." In fact, courts routinely find that statements that lack such phrases are opinion statements. *See In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 800–01 (9th Cir. 2017) (holding that statement "FDA clearance risk has been achieved," which did not include phrases such as "I think" or "I believe," was a statement of opinion because "it is the speaker's personal definition of 'achieved' that here produces the opinion"); *AMI – Gov't Emps. Provident Fund Mgmt. Co. Ltd. v. Alphabet Inc.*, No. 23-CV-01186-RFL, 2024 WL 4353637, at

United States District Court
Northern District of California

*3 n.1 (N.D. Cal. Sept. 3, 2024) ("Contrary to Plaintiffs' argument, not all statements of opinion include such qualifying language like 'I believe' or 'I think.'") (citation and internal quotation marks omitted).

**ii. Whether the Opinion Statements Are False Under *Omnicare***

Under *Omnicare*, a plaintiff can plead the falsity of a statement of opinion in three ways, depending on the theory of falsity advanced by the plaintiff. "First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017) ("*Align*") (quoting *Omnicare*, 575 U.S. at 186). "Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that 'the supporting fact [the speaker] supplied [is] untrue.'" *Id.* at 616 (quoting *Omnicare*, 575 U.S. at 186). "Third, when a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *Id.* (quoting *Omnicare*, 575 U.S. at 194).

Here, Plaintiff argues that the opinion statements at issue are plausibly false under the second and third *Omnicare* "prongs." *See* ECF No. 90 at 20. Defendants disagree, arguing that the AC lacks particularized allegations that satisfy *Omnicare*'s second and third prongs. *See* ECF No. 86 at 15–16.

The Court agrees with Defendants. Although Plaintiff contends that the opinion statements at issue are false under the second and third *Omnicare* prongs, it fails to point to any particularized allegations showing that the opinion statements either contained a statement of fact that was false, or omitted facts going to the basis for the statements that rendered the statements misleading.

Specifically, with respect to Statements 1, 2, 6, 12, and 17, Plaintiff argues that they are false under *Omnicare*'s second prong because they contain positive statements about demand for Enphase's products in Europe that were false because demand was actually declining. *See* ECF

No. 90 at 20. However, Plaintiff fails to point to any particularized and non-conclusory allegations showing that, at the time the opinion statements at issue were made (which was on April 25, 2023, July 27, 2023, and October 26, 2023), demand for the company's products was declining materially in the European market. The allegations to which Plaintiff points allude vaguely to unquantified demand-related "problems for Enphase" in some parts of Europe, but not across the entire European market, at unspecified times in 2023. *See, e.g.*, AC ¶¶ 150, 163 (alleging that that FE-2[3] reported that at an unspecified time "in early 2023" "the residential solar market dried up" in the Netherlands); *see id.* (alleging that, at an unspecified time "around the beginning of summer of 2023" an unidentified "German employee told FE-3 that microinverters were not popular in Germany" and that sales of the same "were going down" by an unspecified amount); *see id.* (alleging that "by 2Q2023," FE-1 "confirmed" that "the decline in demand that had started in early 2023 persisted" in his unidentified European region, and that unidentified and unquantified distributors had begun to push back on new shipments due to unquantified "weakening demand"); *see id.* (alleging that FE-1 notified Defendant Kothandaraman on an unspecified date during the summer of 2023 that demand for Enphase's products was declining in an unspecified amount in his unidentified European region); *see id.* (alleging that on an unspecified date "no later than the end of summer 2023," "European sales directors" of the Netherlands, Germany, and other unidentified "large markets" in Europe stated during weekly shipment review meetings that there was unquantified weakening of consumer demand for Enphase products); *id.* (alleging that unidentified and unquantified "installers" in an unspecified region told FE-3 that they were choosing to use competing products without specifying the extent to which they were doing so). Because these vague allegations fail to specify each of the European regions in which demand allegedly declined, the timing and duration of those declines, and how those declines impacted demand for Enphase's products in the overall European market, the Court cannot reasonably infer that demand for Enphase's products was declining materially across the entire European market at the time Statements 1, 2, 6, 12, and 17 were made. Because

[3] "FE" is shorthand for "[f]ormer employees." *See* AC ¶ 6.

those statements are not plausibly false under *Omnicare's* second prong on the basis that Plaintiff advances, the Court GRANTS Defendants' motion to dismiss with respect to those statements.

Plaintiff also argues that Statements 8, 9, and 11, which were made on July 27, 2023, were false under *Omnicare*'s second prong because they falsely represented that demand for Enphase's products in the Netherlands and Germany was strong when it was declining at the time that those statements were made. *See* ECF No. 90 at 20. However, the allegations to which Plaintiff points do not specify the timing of the purported demand declines or the extent to which demand for Enphase's products was impacted in the Netherlands and Germany. *See, e.g.*, AC ¶¶ 150, 163 (alleging that that FE-2 reported that on an unspecified date "in early 2023" "the residential solar market dried up" in the Netherlands); *see id.* (alleging that "around the beginning of summer of 2023" an unidentified "German employee told FE-3 that microinverters were not popular in Germany" and that sales of the same "were going down" by an unspecified amount); *see id.* (alleging that on an unspecified date "no later than the end of summer 2023," "European sales directors" of the Netherlands, Germany, and other unidentified "large markets" in Europe stated during weekly shipment review meetings that there was unquantified weakening of consumer demand for Enphase products). Accordingly, the Court cannot reasonably infer that demand for Enphase's products was declining materially in the Netherlands and Germany as of July 27, 2023. The Court thus GRANTS Defendants' motion to dismiss with respect to Statements 8, 9, and 11.

Plaintiff also contends that Statements 14, 15, 18, 19, and 22, which were made on October 16, 2023, February 6, 2024, and April 23, 2024, were false under *Omnicare*'s second prong because they falsely represented that a demand slowdown that Enphase experienced in Europe was due to temporary macroeconomic factors even though the real cause of the slowdown was "Enphase-specific and long-term." *See* ECF No. 90 at 20. However, the allegations to which Plaintiff points do not raise the inference that Enphase was experiencing a material demand slowdown in Europe at the time the opinion statements at issue were made that was "Enphase-specific and long-term." *See* AC ¶¶ 170, 182. The allegations to which Plaintiff points are materially identical to the allegations that it cites in the context of Statements 1, 2, 6, 8, 9, 11, 12, and 17. *Compare* AC ¶¶ 170 & 182 *with id.* ¶¶ 150 & 163. As discussed above, those allegations

neither specify the timing and duration of the purported demand declines nor demonstrate that any demand declines that may have occurred in some European regions due to Enphase-specific problems materially impacted the company's performance in the entire European market at any particular point in time. Accordingly, the Court cannot reasonably infer that Statements 14, 15, 18, 19, and 22 were false when made under *Omnicare*'s second prong on the basis that Plaintiff advances. The Court GRANTS Defendants' motion to dismiss with respect to those statements.

Plaintiff also contends that Statements 1, 2, 8, 9, 12, and 13, which were made on April 25, 2023, July 27, 2023, and October 26, 2023, by Defendant Kothandaraman were false under *Omnicare*'s third prong because they gave investors a more favorable impression of the company's performance in Europe than warranted by omitting facts about the negative impact on demand for Enphase's products in Europe caused by market saturation, increased competition, and product service problems. *See* ECF No. 90 at 21.

"[F]or an opinion to be misleading by omission, (1) the 'statement [must] omit[] material facts about the [defendant's] inquiry into or knowledge concerning a statement of opinion,' and (2) 'those facts [must] conflict with what a reasonable investor would take from the statement itself.'" *In re Atossa*, 868 F.3d at 802 (quoting *Align*, 856 F.3d at 615). For example, "[t]he Supreme Court explained in *Omnicare* that if an issuer publicly stated, '[w]e believe our conduct is lawful,' but did not disclose the [speaker's] knowledge that the Federal Government took the opposite view, reasonable investors would be misled because the [speaker's] opinion would not 'fairly align[ ] with the information in the [speaker's] possession at the time.'" *See id.* (quoting *Omnicare*, 575 U.S. at 188–89). "An opinion statement, however, is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Omnicare*, 575 U.S. at 189. That is because "[a] reasonable investor does not expect that every fact known to an issuer supports its opinion statement." *Id.* at 190.

Here, the allegations to which Plaintiff points are devoid of particularized facts showing that (1) demand for Enphase's products in *the entire European market* was being materially and negatively impacted by market saturation, increased competition, and product service problems at the time that the opinion statements at issue were made; and (2) that Defendant Kothandaraman

was aware of those negative impacts at the time he made each opinion statement at issue. *See* AC ¶¶ 140, 153, and 164. Plaintiff's allegations are not particularized and merely suggest that Enphase could have experienced demand problems of an unquantified magnitude, at an unspecified time, and for an unspecified duration in some European regions relating to market saturation, increased competition, or installation and customer service issues.[4] *See id.*; *see also id.* ¶ 139 (alleging that, at an unspecified time, the market for Enphase's products in the Netherlands was experiencing an unspecified amount of "saturation"); *id.* ¶ 163 (alleging that at an unspecified time "by the summer of 2023," FE-3 heard from unidentified and unquantified "installers" that Enphase was losing business to "cheaper competitors" in unspecified regions); *id.* (alleging that unspecified and unquantified "installers" told FE-3 that Enphase was losing an unquantified amount of business in an unidentified region because of customer service, installation, and connectivity issues). Accordingly, the Court cannot reasonably infer that Statements 1, 2, 8, 9, 12, and 13 were false under *Omnicare*'s third prong on the basis that those statements omitted facts about the negative impact on demand for Enphase's products in the entire European market caused by market saturation, increased competition, and product service problems. The Court thus GRANTS Defendants' motion to dismiss with respect to those statements.

Finally, with respect to the remaining statements of opinion at issue, namely Statements 3, 4, 5, 10, 16, 20, 21, 23, 24, 25, and 26, Plaintiff does not meaningfully respond to Defendants' *Omnicare*-based arguments or point to any allegations showing that those statements were false

[4] Some of Plaintiff's allegations regarding increased competition are based on the reports of certain confidential informants ("CI"). *See, e.g.*, AC ¶ 139. Plaintiff alleges that the confidential informants are "former industry participants" and that their reports are based on interviews that were published on a subscriber-based market intelligence platform "and/or Plaintiff's investigation." *See, e.g.*, AC ¶¶ 36-38. However, as Defendants correctly point out, Plaintiff does not allege any particulars as to its "investigation" of those reports or otherwise allege that it fact-checked the reports. Accordingly, the Court cannot reasonably infer that the reports of the confidential informants are sufficiently reliable and based on their personal knowledge. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (holding that confidential witnesses "must be described with sufficient particularity to establish their reliability and personal knowledge"); *see also Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 797 (S.D.N.Y. 2020) (holding that statements made by "anonymous—and often vaguely described—interviewees, with whom plaintiff's counsel has not had contact, but whom counsel has learned about secondhand from citations in a short-seller's report" were not sufficiently detailed to support a claim for securities fraud).

when made under any of the three *Omnicare* prongs. *See* ECF No. 90 at 20–21. Accordingly, the Court finds that Plaintiff has abandoned its securities fraud claims to the extent that such claims are premised on those statements and GRANTS Defendants' motion to dismiss with respect to those statements WITHOUT LEAVE TO AMEND. *See Norfolk Cnty. Ret. Sys. v. Solazyme, Inc.*, No. 15-CV-02938-HSG, 2018 WL 3126393, at *10 (N.D. Cal. June 26, 2018) (granting motion to dismiss securities fraud claims without leave to amend on the ground that the plaintiffs "abandoned" those claims by failing to respond to the arguments made in the defendants' motion to dismiss with respect to certain challenged statements) (citation omitted); *see also Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 888 (9th Cir. 2010) (holding that the plaintiff "abandoned" a claim by failing to respond to the defendant's motion to dismiss that claim).

**b. Other Statements**

The only challenged statements at issue that are not statements of opinion subject to *Omnicare*'s pleading standards are Statements 7 and 15. The Court now analyzes whether Plaintiff has plausibly alleged that those statements were false or misleading when made under the usual standards for pleading falsity.

**i. Statement 7**

Plaintiff alleges that, in a report dated June 7, 2023, a third-party analyst called Oppenheimer reported that, during a meeting with Enphase management, management "'highlighted' that 'the [C]ompany *continues to see strong demand across geographies with no price pressure given demand fundamentals and value-added products*.'" *See* AC ¶ 138 (alterations and emphasis in the original). Oppenheimer "also reported that 'ENPH provided color on the factors supporting the premiums for its products' confirming that, '[i]n Europe,' Enphase '*[w]as not seeing pricing pressure given its differentiated products* despite select reports of price declines on Chinese-based string inverters.'" *Id.* (alterations and emphasis in the original). Plaintiff alleges that the italicized statements just described (collectively, Statement 7) were false or misleading because they omitted that Enphase's business in Europe was experiencing negative impacts because of structural problems, namely market saturation, lack of penetration in new European markets, loss of market share due to increased competition, and loss of business due to

product and service problems. *See id.* ¶ 139.

Defendants argue that the AC lacks particularized allegations showing that Statement 7 was false or misleading on the basis that Plaintiff advances in the AC.[5] *See* ECF No. 86 at 20.

The Court agrees. Plaintiff has not alleged particularized facts indicating that, at the time Statement 7 was made on June 7, 2023, Enphase was experiencing material negative impacts because of undisclosed market saturation, lack of penetration in new European markets, loss of market share due to competition, and loss of business due to product and service problems. The allegations to which Plaintiff points are not particularized and merely suggest that Enphase could have experienced demand problems of an unquantified magnitude, at an unspecified time, and for an unspecified duration in certain European regions relating to market saturation, increased competition, or installation and customer service issues. *See* AC ¶ 139 (alleging, conclusorily, that "[b]y early 2023, the residential solar market in key European countries showed signs of saturation"); *see id.* (alleging that FE-3 heard on an unspecified date in the summer of 2023 from an unidentified person that Enphase's microinverters were not popular in Germany); *see id.* (alleging that FE-2 reported that sometime in the first half of 2023 he learned from unidentified and unquantified installers and distributors in unidentified regions that Enphase's prices were not competitive); *see id.* (alleging that, on an unspecified date, unidentified installers in unspecified regions told FE-3 that they were choosing to use competitors' inverters because Enphase's products were inferior). Accordingly, Defendants' omission of the structural problems in question and their purported impact on Enphase in Europe did not render Statement 7 misleading. *See Sneed*, 147 F.4th at 1131 (holding that Section 10(b) and Rule 10b–5's "anti-fraud provisions do

[5] Defendants also argue in passing that Statement 7 is not actionable because it was made by a third-party analyst and not by Defendants. *See* ECF No. 86 at 24. This argument is unavailing. Plaintiff has cited a binding opinion, which Defendants have not distinguished, that holds that where the statement in question "clearly originated from [the defendant]" and does not "represent a third party's projection, interpretation, or impression, the statement[] may be held to be actionable even if [it is] not [an] exact quotation[]." *See Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004). Here, Plaintiff's allegations indicate that Statement 7 originated from Defendants during a meeting between Enphase management and Oppenheimer, *see* AC ¶ 138, and there is no indication in the AC that Statement 7 reflects a projection, interpretation, or impression by Oppenheimer. Accordingly, Statement 7 "may be held to be actionable" under *Nursing Home Pension Fund*, 380 F.3d at 1235.

United States District Court
Northern District of California

not impose a duty to disclose all material information" and instead "require disclosure only when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading") (citations and internal quotation marks omitted). The Court thus GRANTS Defendants' motion to dismiss with respect to Statement 7.

**ii. Statement 15**

Plaintiff alleges that, during the conference call for Q3 2023 held on October 26, 2023, Defendant Kothandaraman stated: "We are managing through a slowdown in our overall demand. In the U.S., it is due to high interest rates on NEM 3.0. *In Europe, it is due to broad macroeconomic conditions*." AC ¶ 157. Plaintiff alleges that the italicized statement just described (Statement 15) was false or misleading when made because Defendants failed to disclose that the demand slowdown was due to structural problems that impacted Enphase's business in Europe, namely market saturation, lack of penetration in new European markets, loss of market share due to increased competition, and loss of business due to product and service problems. *See id.* ¶ 163.

Defendants contend that this statement was not plausibly false or misleading when made on the basis that Plaintiff advances because Plaintiff has failed to allege any particularized facts indicating that the structural problems in question caused the demand slowdown disclosed in Statement 15. *See* ECF No. 86 at 23.

The Court agrees. The AC is devoid of particularized allegations that raise the inference that, at the time Statement 15 was made on October 26, 2023, demand for Enphase's products in Europe was being negatively impacted by undisclosed market saturation, lack of penetration in new European markets, loss of market share due to increased competition, and loss of business due to product and service problems. The allegations to which Plaintiff points are not particularized and merely suggest that Enphase could have experienced problems of an unquantified magnitude, at an unspecified time, and for an unspecified duration in certain European regions relating to market saturation, increased competition, or installation and customer service issues. *See, e.g.*, AC ¶ 163 (alleging that "by summer 2023" unidentified and unquantified installers told FE-3 that the market in the Netherlands was saturated with solar systems); *see id.*

(alleging that, at an unspecified time in the summer of 2023, Enphase's microinverters were not "popular" in Germany); *see id.* (alleging that FE-1 reported that, at an unspecified time, Chinese competitors engaged in price reductions in unspecified locations); *see id.* (alleging that FE-3 heard "by the summer of 2023" from unidentified and unquantified installers in unspecified regions that Enphase was losing business to cheaper competitors); *see id.* (alleging that FE-3 was told on an unspecified date by unidentified installers in an unspecified region that they were choosing competitors' inverters because they were superior to Enphase's products); *see also id.* ¶¶ 170, 182, 187 (same). These allegations do not plausibly suggest that the slowdown in demand across the entire European market that was disclosed in Statement 15 on October 26, 2023, was caused by the alleged structural problems in question. Accordingly, the omission of those structural problems and their purported impact on Enphase's European business did not render Statement 15 misleading. *See Sneed*, 147 F.4th at 1131.

**2. Scienter and Loss Causation**

Because Plaintiff has failed to plausibly allege that any of the challenged statements at issue were false when made, the Court need not, and does not, reach Defendants' arguments that Plaintiff has failed to plead scienter and loss causation.

**B. Claims under Section 20(a) of the Exchange Act**

"Section 20(a) of the Securities Exchange Act of 1934 provides for liability of a 'controlling person.'" *In re NVIDIA*, 768 F.3d at 1052 (quoting 15 U.S.C. § 78t(a)). "To establish a cause of action under this provision, a plaintiff must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b–5, and then show that the defendant exercised actual power over the primary violator." *Id.* (citation omitted). A claim under Section 20(a) can survive only if the underlying predicate Exchange Act violation also survives. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017).

Plaintiff asserts a claim under Section 20(a) against the Individual Defendants based on allegations that they exercised power and authority over Enphase's operations and the dissemination of the statements challenged in this litigation. *See* AC ¶¶ 300–03.

Defendants move to dismiss this claim on the ground that it fails because Plaintiff's claim under Section 10(b) fails. *See* ECF No. 86 at 33.

The Court agrees. Because Plaintiff has not plausibly alleged a primary violation of Section 10(b), its claim under Section 20(a) is subject to dismissal.

Accordingly, the Court GRANTS Defendants' motion to dismiss the Section 20(a) claim.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss. The dismissal is WITHOUT LEAVE TO AMEND with respect to Statements 3, 4, 5, 10, 16, 20, 21, 23, 24, 25, and 26. The dismissal is WITH LEAVE TO AMEND with respect to all other challenged statements.

Plaintiff may file an amended complaint within 30 days of the date this order is filed to cure the deficiencies discussed herein, to the extent that it can do so without contradicting the allegations in its prior pleadings. If Plaintiff files an amended complaint, it may not add new claims, defendants, or challenged statements, and it shall file a redline comparing the AC with the amended complaint. If Plaintiff opts not to attempt to cure the deficiencies identified in this order, it may file a notice of such election by the same deadline. A failure to file a timely amended complaint will result in dismissal of this action with prejudice.

**IT IS SO ORDERED.**

Dated: September 28, 2026

JON S. TIGAR
United States District Judge